BRAE BURN, INC., *v.* CITY OF BLOOMFIELD HILLS.

ROBINSON *v.* SAME.

MUNICIPAL CORPORATIONS — ZONING ORDINANCE — VARIANCE — EX-TENSION.

Orders granting writs to compel issuance of building permits to owner of property in residential zone upon which plaintiff owner had, under a special permit, theretofore operated a geriatric hospital for 30 persons in a 20-room home, so as to remodel barn to accommodate additional patients and to erect a 3-story office building elsewhere on the premises are reversed; the city zoning ordinance not being confiscatory as to such property under circumstances involved (CL 1948, § 125.584; City of Bloomfield Hills Zoning Ordinance No 69).

Appeal from Oakland; Hartrick (George B.), J. Submitted June 25, 1957. (Calendar Nos. 46,830, 46,831.) Decided November 26, 1957.

Mandamus by Brae Burn, Inc., a Michigan corporation, against City of Bloomfield Hills, a municipal corporation, and certain of its officials, to enforce issuance of building permit. Similar action by Harley J. Robinson, Anna P. Robinson and Arthur E. Moore. Cases consolidated for trial and appeal. Writs ordered issued. Defendants appeal. Reversed.

REFERENCES FOR POINTS IN HEADNOTES

58 Am Jur, Zoning § 140.

*Walter R. Denison* (*Arthur E. Moore,* of counsel), for plaintiffs.

*Howlett, Hartman & Beier* (*William B. Hartman,* of counsel), for defendants.

Smith, J. Again we review a zoning ordinance. The property involved, located on Woodward avenue, in the city of Bloomfield Hills, is the former Hunter estate property. It is some 40 acres in extent and consists of a main building (of 20 rooms and 8 baths) set back a substantial distance from Woodward avenue, and a number of smaller accessory buildings, all "typical * * * of a passing era." It was purchased by Dr. Harley Robinson, one of the plaintiffs herein, in 1951. He desired to use it as a rest home but was informed that the property was zoned for residential use. Consequently, he applied to the city commission, the planning commission, and, finally, to the board of appeals for aid in his desire to use the property he had purchased as a convalescent home. "And you represented," he was asked, "to the members of the city commission and members of the planning commission that you had gotten into this predicament through no fault of your own and it would be a hardship on you if you were not permitted to operate the property as a rest home?" The doctor answered in the affirmative. At any rate, whatever the pleas made, the board of appeals granted him what is described in the record as a "variance." It reads as follows:

"Resolved, that on the appeal of Dr. Harley J. Robinson from the decision of the building inspector denying his application for a certificate of compliance for the use of the Hunter house on South Woodward avenue as a convalescent home: It is hereby determined that there are practical difficulties and

particular and unnecessary hardships in requiring the carrying out the strict letter of the zoning ordinance with respect to said buildings, and further that the variance applied for under the conditions set forth in the application, to-wit: that said institution shall not be qualified as a tax-free organization and that not more than 30 persons will be cared for in said home, will not change the character of the neighborhood involved and will conform to the spirit of the ordinance.

"Wherefore, it is hereby ordered that a special permit be and the same hereby is granted to Dr. Harley J. Robinson for the use of the residential dwelling on South Woodward avenue in the city of Bloomfield Hills known as the Hunter house on the property known as 'Brae Burn,' as a convalescent or rest home as described and applied for in his petition to this board, on conditions, however, that said home be owned, operated and supervised by the said Dr. Harley J. Robinson individually and personally, upon the further condition that said dwelling house be not enlarged or added to, upon the further condition that not more than 30 persons shall be cared for in said home at any one time and upon the further condition that said home shall not become qualified as a tax-free institution."

. It is pertinent to observe that certain of the restrictive conditions above recited and now attacked seem to have had their origin in a vague "agreement" between the petitioning doctor and the board. Thus we note in the record:

"*Q.* At the time the permit was granted, did you not represent you would not require additional facilities?

"*The Court:* We are talking about in the original instance.

"*Q.* At the time you had the hearing before the board of appeals and asked for the permit and got it.

"*A*. There was some agreement to that effect, yes."

At any rate, with this variance, granted upon these conditions (which the doctor now claims were "illegal and void as being entirely beyond the scope and authority of zoning"), he commenced the operation of the rest home upon the property and spent considerable sums in its improvements.

Thereafter Dr. Robinson conveyed to Brae Burn, Inc., a Michigan corporation of which he is one of the shareholders, a rectangular parcel of 14–1/2 acres. This piece comprised the central part of the former Hunter estate property and included the main building heretofore described. In June of 1954 the corporation filed an application to enlarge the rest home (and remodel the barn) in order that additional patients might be accommodated. It was refused. A writ of mandamus was then sought by the corporation to compel the city of Bloomfield Hills, and certain officials thereof, to issue the permit theretofore requested.

There is a second suit before us (both cases were consolidated for trial). In the second suit, which is likewise for a writ of mandamus, Dr. Robinson (with Anna P. Robinson) and his present counsel, Arthur E. Moore, are the plaintiffs. They sought to construct a 3-story office building south of Brae Burn on Woodward avenue. Their application for a building permit was likewise denied upon the ground, in part, that the property was zoned as residential. The trial court, being of the opinion that the limitation on the use of the property was arbitrary, discriminatory, and unconstitutional, ordered that the writs issue in each of the actions. Upon leave granted, the defendant city of Bloomfield Hills took an appeal in the nature of certiorari.

Before getting into the merits of the validity of the zoning scheme itself, we will advert to a preliminary issue, the validity of the particular regulation here involved. It is the contention of appellees that zoning ordinance 69, adopted on July 20, 1954, was adopted illegally for want of a statutory public hearing. (CL 1948, § 125.584 [Stat Ann § 5.2934].) In more detail it is urged that the minutes of the city commission do not show that the public meeting theretofore advertised was in fact held on the date set, namely, June 29, 1954. The minutes of the date of adoption, however, state that a "public hearing was held at the Bloomfield Hills School on Vaughn road on Tuesday, June 29, 1954." What actually happened was that the meeting was in fact held, and a record kept, but not in the minute book. We agree with the trial court that the omission, though contrary to good practice, is not fatal. We also agree that there is no showing of invalidating material amendment and that parol and other evidence may be admitted to supplement (although not to contradict) the public record. As we held in *Township of North Star* v. *Cowdry*, 212 Mich 7, 14, 15:

"It is first urged   *   *   *   that   *   *   *   the proceedings of the township board cannot rest in parol, and that, except in a direct action to correct the record, the action of the township boards, and other official boards, can be proven only by the record kept by the proper official. Many cases are cited by counsel claimed to be in support of this proposition.   *   *   *

"While there is language used in some of these decisions which would tend to show that a record cannot be supplemented by parol evidence, an examination of the cases will show that the attempt was made to vary and contradict the record. We recognize the rule to be that the record cannot be contradicted, or impeached by parol testimony. We think

the correct rule is well stated in *Township of Taymouth* v. *Koehler,* 35 Mich 22.  \*  \*  \*

"It is frequently competent to show by parol matters in aid of the record where the same is ambiguous, or where entries have been omitted."

The ordinance, then, was validly adopted and plaintiffs were subject to it.   Plaintiff Robinson, however, seeks to avoid its effect by setting up that the substantial sums expended in the improvement of the premises afford plaintiffs "the right to continue and carry out the business venture  \*  \*  \* (*i.e.,* that) plaintiffs have a vested right to so use the property."   Apparently the argument is that the variance sought by Dr. Robinson and granted to him in order to help him out of his predicament is now to be used by him as a sword rather than a shield, that he can now operate "unhampered either by illegal 'variance' conditions or subsequently enacted ordinances."   The city, on the other hand, argues that Dr. Robinson is estopped to attack the variance by reason of the fact that he sought and received substantial benefits from it, citing 11 Am Jur, Constitutional Law, § 121, pp 766, 767.   We do not find it necessary to decide this point.   Regardless of the merits of a technical estoppel it is clear, as the trial court clearly perceived and held, "that the sums so spent in improvement were for the existing geriatric hospital with notice of the city's claim."   There is no merit in the claim that rights vested under such circumstances. *City of Coldwater* v. *Williams Oil Co.,* 288 Mich 140, has no application to these facts.

We are brought, then, to the merits of the zoning scheme itself.   In view of the frequency with which zoning cases are now appearing before this Court, we deem it expedient to point out again, in terms not susceptible of misconstruction, a fundamental principle: this Court does not sit as a superzoning com-

mission. Our laws have wisely committed to the people of a community themselves the determination of their municipal destiny, the degree to which the industrial may have precedence over the residential, and the areas carved out of each to be devoted to commercial pursuits. With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability. For alleged abuses involving such factors the remedy is the ballot box, not the courts. We do not substitute our judgment for that of the legislative body charged with the duty and responsibility in the premises. As Willoughby phrased it in his treatise, Constitution of the United States (2d ed, 1929), vol 1, § 21, p 32: "The constitutional power of a law-making body to legislate in the premises being granted, the wisdom or expediency of the manner in which that power is exercised is not properly subject to judicial criticism or control." We held similarly in *Tel-Craft Civic Association* v. *City of Detroit,* 337 Mich 326, 331:

"Unless it can be shown that the council acted arbitrarily or unreasonably, their determination is final and conclusive and no court may alter or modify the ordinance as adopted.

" 'While it is within the province of the courts to pass upon the validity of statutes and ordinances, courts may not legislate nor undertake to compel legislative bodies to do so one way or another. (Citing cases.) The court erred in seeking to compel the defendant mayor and city commission members to amend the ordinance.' *Northwood Properties Co.* v. *Royal Oak City Inspector,* 325 Mich 419, 423.

" 'The ultimate power is vested in the council, and its good faith in acting for the public welfare cannot be questioned by the judicial branch of government.' *Gratton* v. *Conte,* 364 Pa 578, 583 (73 A2d 381, 384)."

It is a necessary corollary of the above that the ordinance comes to us clothed with every presumption of validity, *Hammond* v. *B. H. Building Inspector,* 331 Mich 551, and it is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property. *Janesick* v. *City of Detroit,* 337 Mich 549. This is not to say, of course, that a local body may with impunity abrogate constitutional restraints. The point is that we require more than a debatable question. We require more than a fair difference of opinion. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit,* and that there is no room for a legitimate difference of opinion concerning its reasonableness. Such cases have in fact occurred (*e.g., Bassey* v. *City of Huntington Woods,* 344 Mich 701, 705, 706, where a lot zoned "residential" was subject as such to side-line restrictions leaving only a 4-foot width to accommodate a 2-family dwelling) but they must in their very nature be extreme and the rule thus stated cannot justify the great numbers of cases reaching this Court.

We have stressed, heretofore, in these zoning cases, the principle that each case must be judged on its own facts. Some confusion may have arisen from its frequent repetition. The statement is merely a truism in the law, applicable to all cases, from arbitration to zoning. It solves nothing. Most assuredly it does not imply that each zoning case stands alone, unrelated to and untouched by the others. To put it in another way, we have no "Woodward avenue rule," no "traffic" rule as such, no

"diminution in value" rule. All these are merely factors to be considered, pieces of the mosaic. The question always remains: As to this property, in this city, under this particular plan (wise or unwise though it may be), can it fairly be said there is not even a debatable question? If there is, we will not disturb.

Now as to the property before us and the ordinance before us: Much of the testimony taken went to the comparative value of the land if used for residential rather than commercial purposes. There is no doubt that its commercial value far exceeded its residential value. At the same time there is no doubt that even as residential property the land had considerable value. Thus one of plaintiffs' witnesses testified that the office building site was worth $32,400 for commercial use but only $15,000 for multiple dwelling use. The properties (Brae Burn and the office building site), we are told, "lie on Woodward avenue, one of the busiest thoroughfares in the State of Michigan. They are natural business sites." It is urged, from this and similar considerations, that "such zoning is confiscatory," that it is unreasonable, and that the property is not being put to its best use. Disparity in values between residential and commercial uses will always exist. In the leading case of *Village of Euclid* v. *Ambler Realty Co.*, 272 US 365 (47 S Ct 114, 71 L ed 303, 54 ALR 1016), Mr. Justice Sutherland, in upholding the ordinance, noted that the property involved was worth about $10,000 per acre for industrial use, as compared with $2,500 per acre for residential use. If such a showing serves to invalidate an ordinance the efforts of our people to determine their living conditions will be hopeless. To avoid "confiscation" in this sense (the obtaining of the highest dollar for one particular lot) will result in confiscation of far greater scope in property values in the

municipality as a whole due to its inability to control its growth and development. It must be stressed that we are not, on this record (as we pointed out in *Anderson* v. *City of Holland*, 344 Mich 706, 710) "dealing with a situation in which the property involved is unsuitable for residential purposes and has little or no value if so restricted." In such case the issue of confiscation is properly before us. See Yokley's discussion (1 Yokley, Zoning Law and Practice (2d ed), pp 47, 48) of our *Fenner* v. *City of Muskegon* case, 331 Mich 732:

"Late in 1951, the Supreme Court of Michigan decided a case that aptly illustrates what we mean when we say that an ordinance that so deprives an owner of land of any fruitful use of his property as to amount to confiscation will not be sustained.

"In this case the zoning ordinance pertaining to the area in which the plaintiff's land was situated restricted the area to residences, churches, schools, libraries, and accessory buildings, and the evidence established clearly that the land was not suitable for any one of these uses. The land was low, marshy and boggy, with a considerable area under water. Nearby streets were unimproved and the only houses nearby were substandard and of the 'blighted area' variety.

"The Supreme Court reversed the lower court and very properly ruled the ordinance invalid as to the plaintiff with the following comment:

" 'We conclude that the application of the zoning ordinance to the lands in question is unreasonable and in practical effect, confiscatory of plaintiff's property.'

"In the case of *Arverne Bay Construction Company* v. *Thatcher*, 278 NY 222 (15 NE2d 587, 117 ALR 1110), reversing 253 App Div 285 (2 NYS2d 112), the New York court of appeals held that to sustain an attack on the validity of a zoning ordinance an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on

his property preclude its use for any purpose to which it is reasonably adapted. The case of *Fenner* v. *Muskegon*, just discussed, seems well within the rule announced in this well known New York decision."

In the case before us, however, such unsuitability for residential purposes (*Ritenour* v. *Township of Dearborn*, 326 Mich 242), lack of market for such purpose (*Long* v. *City of Highland Park*, 329 Mich 146), or "dead land" without residential value (*Janesick* v. *City of Detroit*, 337 Mich 549) do not appear. On the contrary, we find in the record that there is a new and successful residential development on Woodward avenue immediately south of plaintiffs' property (Cranbrook Manor). It cannot, upon such facts, be held that the city's legislative body acted in a whimsical manner in zoning this property as residential, that it is totally unsuited for its zoned use, or that it is confiscatory in the constitutional sense.

It is argued, also, that nearby is found an office building (McManus, John & Adams, at the northwest corner of Woodward avenue and West Long Lake road), and that across the street is found another similar rest home. These differences are bound to occur in any zoning plan. Somewhere one zone must end and another start. There will always be peripheral problems. But as the supreme court of Illinois expressed it in a recent "across-the-street" case (*Wesemann* v. *Village of La Grange Park*, 407 Ill 81, 87–89 [94 NE2d 904]):

"It is practically a suburb of Chicago and is about 15 miles to the west of the Loop district. The village authorities have been diligent in attempting to enforce its zoning regulations. It is the province of the municipal body to draw the line of demarcation as to the use and purpose to which property shall be assigned or placed, and it is neither the province nor

duty of courts to interfere with the discretion with which such bodies are invested, except where there is a clear showing of an abuse of that discretion, which is not the case where the question is merely debatable. * * *

"The fixing of zoning lines is a matter of legislative discretion and necessarily results in a different classification of uses on either side of the line. This does not render limitations on use of property near the boundary line in a more restricted district unreasonable or invalid."

See, also, 1954 U of Ill L Forum 716, at p 719; Babcock, 15 U of Chicago L Rev 87.

The trial court also held that the residential classification of plaintiffs' properties, both the multiple dwelling area, 400 feet in depth along Woodward avenue, and the single-dwelling area of substantial depth to its rear, was unreasonable and confiscatory because, as we read it, "The day is since past when Woodward avenue frontage anywhere between Pontiac and Detroit is logically compatible with residential use." The developers of Cranbrook Manor would seem justified in their contrary belief. Contrariwise, also, seems to have been the opinion of one of plaintiffs' experts, Thomas Elston, who testified that, at least from a traffic and noise standpoint, there would be no reason for saying that the rear part of the property fronting on Woodward was not an attractive residential property. Be that as it may, however, the wisdom of the ordinance, as we have observed, is not our concern. There are, obviously, those of our people to whom nearness to a great city, and ready access to transportation thereto, outweigh considerations of noise and the hazards of heavy traffic. It is not our function to debate the merits of their respective positions.

This Court is not equipped to zone particular parcels of land. We do not see the land, we do not see

the community, we do not grapple with its day-to-day problems. When we interpose with our writ and command, for example, that a certain tract on Woodward avenue be turned over to commercial pursuits, the owners of the tract across the street are before us for similar dispensation the next day, and the areas north and south the day after. Thus we assume the zoning function. Their argument is cogent and not difficult to follow: What is sauce for the goose is sauce for the gander. So it is. But if the childish jingle is to be accorded the dignity of a legal axiom, if it is to replace, at least in these chambers, the deliberations of the legislative body, we would do well to re-examine our appellate function.

The function of the courts, with respect to these cases, lies largely in 2 broad areas: (a) has the legislative body the authority to act? (b) have the requirements of administrative due process been observed with respect to adoption, interpretation, and administration of the ordinance in question? The first brings to us the validity and breadth of the delegation of power. The second brings to us the legality of its use, whether the ordinance was properly adopted, whether exercised as to all alike, regardless of local pressures and improper influences, and similar questions. These are the areas in which we may be presumed to have some degree of competence. But many of the cases coming to us involve merely the legislative judgment. They are the peripheral problems (should the line be drawn here, or there?) and the allegations of more advantageous use, with its corollary of "confiscation" (the property is worth more if devoted to some other use). Save in the most extreme instances, involving clearly whimsical action, we will not disturb the legislative judgment. It is immaterial that we, as legislators, would have been wiser. We are acutely

aware of the doctrine of the separation of powers. A legislative determination within its sphere of government is conclusive upon us. It was Mr. Justice Holmes who said in *Noble State Bank* v. *Haskell,* 219 US 104 (31 S Ct 186, 55 L ed 112, 32 LRA NS 1062, Ann Cas 1912A, 487), on rehearing,* p 580: "We fully understand * * * the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern."

Tested by these established principles it is clear beyond question that it lies within the competence of the city of Bloomfield Hills to plan its future growth and development, that its legislative body had authority to act, and that, so far as here questioned, the requirements of administrative and procedural due process have been observed (*e.g.,* here there was no fatal defect in the observance of the requirement of a public hearing). Given these indispensable requirements, such factors as the relative values of competing uses, and the proximity of nonconforming uses, assume their rightful places as matters primarily for legislative concern, unless, as noted, we have patently a capricious and irrational invasion of property, the merits undebatable by reasonable men, the action indefensible to any save those whose minds have been made incandescent by partisan zeal or pursuit of gain. The prohibitory interposition of the courts, upon this record, is not warranted.

There is no merit in the additional issues raised by the appellees. Reversed. Costs to appellants.

EDWARDS, VOELKER, and BLACK, JJ., concurred with SMITH, J.

DETHMERS, C. J., and SHARPE, KELLY, and CARR, JJ., concurred in the result.

---

* See 219 US 575 (31 S Ct 299, 55 L ed 341).—REPORTER.