## GRAY v. GRAND TRUNK WESTERN RAILROAD COMPANY.

1. MUNICIPAL CORPORATIONS—ZONING—MANUFACTURING DISTRICT—
RAILROAD SWITCHING YARD—CONSTRUCTION OF ZONING ORDINANCE.
Municipal zoning ordinance in which territory sought to be used
by railroad for switching yard was zoned for manufacturing
purposes did not bar such proposed use, since it was not in-
cluded in specifically enumerated prohibited uses, the prin-
ciple that inclusion by specific mention excludes what is not
mentioned being applicable.

2. PUBLIC UTILITIES—CORPORATIONS—ULTRA VIRES.
All activities of a public service corporation, unless *ultra vires*,
must be in furtherance of its corporate function.

3. RAILROADS—SWITCHING YARD—PUBLIC DUTIES.
The operation of a freight switching yard is peculiarly in keep-
ing with the public duties of a railroad and is not designed to
serve some mere private need, since the interchange of traffic
is an essential part or act in the transportation.

4. MUNICIPAL CORPORATIONS — CONTRACTS — RAILROADS — CONSIDER-
ATION.
Legislative action of city in executing an agreement with a
railroad whereby latter acquired, for various enumerated con-
siderations, property upon which it proposed to operate an
auxiliary freight switching yard in order to better serve manu-
facturer shippers in the industrial area *held,* not arbitrary or
capricious.

---

* Continued from Volume 353.

REFERENCES FOR POINTS IN HEADNOTES
[1]  58 Am Jur, Zoning § 133.
[2]  13 Am Jur, Corporations § 739.
[3]  44 Am Jur, Railroads § 357.
[4]  38 Am Jur, Municipal Corporations § 487.
[5, 6]  44 Am Jur, Railroads § 358.
[7]  38 Am Jur, Municipal Corporations § 494.
[8]  11 Am Jur, Constitutional Law § 198.
[9]  39 Am Jur, Parties § 75.
[10]  28 Am Jur, Injunctions § 350.

5. RAILROADS—NOISE—VIBRATION—NUISANCE.

   The unavoidable amount of noise and vibration incident to the normal operation of a railroad does not constitute an actionable nuisance.

6. SAME—SWITCHING YARD—NUISANCE.

   It is not to be anticipated that the establishment of an auxiliary freight switching yard by a railroad incident to the service it renders to nearby industries will result in an actionable nuisance.

7. MUNICIPAL CORPORATIONS—LEGISLATIVE POWER—EXTENSION OF STREET—SWITCHING YARD.

   A city's agreement not to extend a specified street across an auxiliary freight switching yard which defendant railroad proposed to establish in order to serve nearby industrial plants *held,* clearly within the legislative power of city commission.

8. CONSTITUTIONAL LAW—LEGISLATIVE BODY—COURTS.

   The good-faith action of a law-making body, acting for the public welfare, may not be questioned by a court.

9. INJUNCTION — PARTIES — INTERVENTION — PLEADINGS — EVIDENCE — DISCRETION OF COURT.

   It was not an abuse of judicial discretion for trial court to deny the intervention, as parties plaintiff, of some 50 persons, whose appearance on the opening day of trial in suit to enjoin the establishment of an auxiliary freight switching yard pursuant to an agreement between defendant railroad company and defendant city, where it is conceded that it would not have altered either the pleadings or the proofs.

10. COSTS — PUBLIC QUESTION — RAILROAD SWITCHING YARD — INJUNCTION.

   No costs are allowed in suit to enjoin the establishment of railroad switching yard pursuant to agreement between the railroad and city, where a public question is involved.

Appeal from Oakland; Hartrick (George B.), J. Submitted April 17, 1958. (Docket No. 56, Calendar No. 47,723.) Decided September 10, 1958.

Bill by George W. Gray and other property owners against Grand Trunk Western Railroad Company and the City of Pontiac to enjoin development of

freight switching yard.  Bill dismissed.  Plaintiffs appeal.  Affirmed.

*Robert W. Hodge,* for plaintiffs.

*F. R. Henderson* and *R. L. Livesay* (*Patterson & Patterson and Barrett,* of counsel), for defendant Grand Trunk Western Railroad Company.

*William A. Ewart,* for defendant City of Pontiac. .

SMITH, J.  This case involves the location of a new freight switching yard in the northern part of the city of Pontiac.  Adjacent property owners sought injunctive relief.  It was their objection that the proposed construction would violate the city's zoning ordinance and "would be a continuing nuisance."  The trial chancellor held that a "sustainable, factual violation of the ordinance is not here established" and that "the allegations of nuisance are in the nature of conjecture rather than factual."  The plaintiffs are before us on a general appeal.

The record discloses that the defendant Grand Trunk Western Railroad Company constructed a "belt line" single-track railroad across the northern part of the city of Pontiac many years ago, that portion west of Baldwin avenue being completed in the year 1920.  This is the area in which it is proposed that the new "industrial support yard" be located.  The need for such yard has arisen from the inadequacies of the present Johnson avenue yard to service the rail traffic involved.  Testimony was presented to the trial chancellor that "during the last few years there has been a great change in the service required at the motor company plants because of the increase in use of cars especially equipped for certain types of parts.  There are cars equipped directly for engines and transmissions and are dif-

ferent types of cars altogether. In the old days they used the box cars. * * * It means we have to have twice as many cars in the terminal as we had before due to the fact that the cars have to go in the plant and loaded, the specially equipped cars put in." There have been, in addition, substantial increases in production at the Pontiac Motor plant and the Fisher Body plant. As a result and these and related factors the defendant railroad has received complaints from shippers in the area that the service is inadequate and must be improved, and from public authorities that it has blocked street crossings excessively, with resulting impedance of traffic flow. In addition, we are told, the railroad has been informed that if it cannot provide additional yard facilities the shippers "would have to consider that before building any additional plants in Pontiac."

The railroad, accordingly, began a survey of different sites available for additional yard facilities and selected the site here in issue. In order to construct the yard at this site the railroad approached the city of Pontiac for the purchase of property at this location owned by the city. Negotiations ensued. the city retaining Mr. Charles Blackman, a consulting engineer from Louisville, Kentucky, for purposes of exploration of other possible sites. After an exhaustive consideration of various factors, including such matters as comparative costs, grade levels, street crossings, distances from plants served, adjacent housing and industries, viaducts required, track space, and related matters, the defendant city and railroad entered into the agreement here under consideration upon May 21, 1957. Its provisions are summarized by appellees as follows:

"(1) That the city sell to the railroad the property required.

"(2) That it execute its conveyance.

"(3) The city agrees to forego any future attempts to extend Stanley avenue to the north across the support yard at grade.

"(4) The railroad agrees to construct and maintain a chain link fence on both the north and south sides of the yard.

"(5) The ballast of the yard to be washed pea gravel with calcium chloride to be used if any dust results.

"(6) To provide a green belt of tree planting on a part of the northerly side of the yard, and to construct embankment on the south side and place a climbing vine on the link fence on the south side.

"(7) The railroad consents to the extension of Columbia avenue across the belt line at grade.

"(8) The railroad consents to the extension of Hollywood avenue across the belt line at grade and agrees to donate to the city without compensation an easement for a public roadway for that purpose.

"(9) That the railroad will construct and maintain a pedestrian overpass over the yard, plans to be prepared by the railroad and approved by the city. The cost of construction and future maintenance repair to be borne 1/2 by the railroad and 1/2 by the city.

"(10) No Sunday switching in the yard except 'in cases of national emergency or as required to fulfill its common carrier and/or tariff obligations under Federal or State laws.'

"(11) All buildings in the yard to be of either painted sheet steel material or masonry block.

"(12) The railroad agrees during 1958 to make changes in the P. O. & N. yard which will minimize switching over Columbia avenue and Montcalm street.

"(13) Only diesel power to be used in the yard.

"(14-a-b-c) Construction and maintenance of the yard to be subject to inspection by the city, with recourse by the city for the remedy of mandatory injunction to enforce the provisions of the agreement as to construction and maintenance."

The attack upon this agreement, as has been noted, relates primarily both to alleged violation of zoning and to nuisance. We will consider the objections made in the order asserted.

First, as to zoning, the ordinance here to be considered was adopted by the city in 1938. The area under consideration is therein zoned as "Manufacturing 1." Likewise in the so-called "Master Plan for the City of Pontiac, Michigan" adopted April 21, 1948, the area is designated as "Manufacturing." As to the location of railroads and appurtenances thereto, the zoning ordinance discloses careful thought. We find that in Residence 1 districts "Railway rights-of-way" are permitted. In Residence 2 districts the permissive use as to railroads is broader, there being permitted not only the railroad right-of-way, but also "passenger stations, trackage and structures incidental thereto" but not including "freight stations or yards, shops, roundhouses or other storage, repair or servicing facilities." In what zone, then, are such functions permissible? We find no such permitted user in Residence 3 districts. Coming, however, to the Manufacturing districts, with which we are here concerned, the pattern of the ordinance changes. In these districts, rather than listing the permitted uses, the draftsmen have listed only the prohibited uses. Not only, however, is there no prohibition therein of railroad activities, but, on the contrary, we find on the zoning map (attached to the zoning ordinance) that the Johnson avenue freight yard, hereinbefore mentioned, and the area surrounding it, are zoned "Manufacturing 1." The trial court's conclusion that a freight yard is not a prohibited use in areas zoned Manufacturing 1 is inescapable. The catch-all phrase (following 51 specified forbidden uses in the zone) that forbade "any other trade, industry or use that is injurious, noxious, offensive, or hazardous by reason of the

emission of odor, dust, fumes, smoke, noise or vibration" does not derogate from the accuracy of the conclusion. Such clauses are properly construed in accordance with the principle *expressio unius est exclusio alterius.* As we held in *Van Sweden* v. *Van Sweden,* 250 Mich 238, 241:

"The statute does not include a carpenter's helper in its mention of business callings, unless the language 'or any person coming within the provisions of this act,' serves as a catch-all. If such were its purpose, it could have been made plain by omitting special mentioned callings and stating that the act applies to every employer. The enumerated callings are easily comprehended, and a search of the act and its amendments fails to disclose any further inclusion by the term, 'any person coming within the provisions of this act.' It is a familiar rule that inclusion by specific mention excludes what is not mentioned."

See, also, to the same effect as to zoning laws, *Marshall* v. *Holbrook,* 276 Mass 341 (177 NE 504); 3 Metzenbaum, The Law of Zoning (2d ed), p 1811; 58 Am Jur, Zoning, § 11, p 946.

Appellants, however, insist that the operation of switching yards involves "inherent nuisances," and, moreover, that such operation is performed in the road's private capacity, rather than in its capacity in the service of the public, thereby, it is argued, subjecting it to an enlarged measure of liability. *Baltimore & Potomac R. Co.* v. *Fifth Baptist Church* (1883), 108 US 317 (2 S Ct 719, 27 L ed 739). The distinction made, even if valid (and we note from 6 ALR 723, 731, that it is taken only by a minority of the courts), is both slippery and tenuous, involving, as it does, a categorization (as either public or private) of the many and diverse activities of a public service corporation, all of which, unless *ultra vires,* must be in furtherance of its corporate func-

tion. So far as the operation of a freight switching yard is concerned, it seems peculiarly in keeping with the public duties of a railroad. As the New York court of appeals held in *Ball* v. *New York Central R. Co.*, 229 NY 33, 40, 41 (127 NE 493):

"In the transportation of freight the railroads act in a public capacity and in the proper discharge of their duty to the public. The interchange of traffic is an essential part or act in the transportation. The public is entitled to an efficient and prompt service in the way of transportation of persons and freight and the railroad is shielded from responsibility for consequential and incidental damages from careful and nonnegligent acts, which are necessary and unavoidable, to bring about such service. (Citing cases.) The freight terminal yard is the natural and normal place for interchanging movements. When by reason of an increase of traffic or other just reason the interchanging movements cannot be accomplished within the yard they may be facilitated and aided by the use of the tracks connected with and adjacent to the yard. The defendant was justified in any use of its tracks in connection with the yard which was reasonably necessary and incidental to that lawful situation."

In the case before us we agree with the trial chancellor that the switching yard in question is essential to a proper operation of the railroad in the public interest and is not designed to serve some mere private need. The testimony amply sustains the position that expanded yard facilities in the proposed location are necessary to the proper flow of railroad traffic to and from industrial plants in the city of Pontiac. It follows, then, that we cannot hold the legislative action of the city in the premises to have been arbitrary or capricious.

The "inherent nuisance" argument is equally without merit. There is no doubt, of course, that a rail-

road, in its normal operations, subjects those nearby to a certain unavoidable amount of noise and vibration. Such do not, however, constitute an actionable nuisance as that term is employed in the law. Justice COOLEY stated the principle in the early case of *Grand Rapids & Indiana R. Co.* v. *Heisel,* 38 Mich 62, 70 (31 Am Rep 306), in these terms:

"The railroad is not a public nuisance, and no right of action can arise against the company until by negligence or improper management they do or suffer to be done something injurious to the abutting proprietor which the permission to occupy the street would not justify. The general principle here stated has been recognized in the following cases: *Moses* v. *Pittsburg, F. W. & C. R. Co.,* 21 Ill 516; *Murphy* v. *City of Chicago,* 29 Ill 279 (81 Am Dec 307); *Stetson* v. *Chicago & E. R. Co.,* 75 Ill 74; *Chicago, B. & Q. R. Co.* v. *McGinnis,* 79 Ill 269; *Elizabethtown, L. & B. S. R. Co.* v. *Combs,* 10 Bush (73 Ky) 382 (19 Am Dec 67); *Carson* v. *Central R. Co.,* 35 Cal 325; *Porter* v. *North Missouri R. Co.,* 33 Mo 128. It is a legal solecism to call that a public nuisance which is permitted to competent authority; *Harris* v. *Thompson,* 9 Barb (NY Sup) 350; *Danville, H. & W. R. Co.* v. *Commonwealth,* 73 Pa 29, and cases cited. The nuisance, whether it be public or private, must be found in the subsequent misconduct of the railroad company, and not in their acceptance of the permission to occupy the highway."

See, also, *Dolan* v. *Chicago, M. & St. P. R. Co.,* 118 Wis 362 (95 NW 385), wherein the court held as follows:

"It must follow that, if a railway company exercises reasonable and proper diligence and care in the location of its yards and in its management, it has performed its whole duty. Impossibilities cannot be required. Duties cannot be imposed, and punishments inflicted, simply because the duties have been performed. If injury results to others, it must in

such case be *damnum absque injuria*. The same rule must apply which applies to noise and smoke and steam resulting from the operation of the railroad. If these annoyances result simply from the necessary and proper operation of the road, they must be borne. If the company use the best and most improved devices to prevent injury to others, it is protected by its franchises. If it is negligent in this regard, it must respond in damages, if a nuisance is thereby created."

This is not to say, of course, that a railroad may not, through negligent or oppressive operation, make itself liable to either the damage or the injunctive remedy, but we will not anticipate such conduct. Such cases relied upon by appellant, as *Baltimore & Potomac R. Co.* v. *Fifth Baptist Church, supra,* are not in point. That case involved the erection of an engine house and machine shop, after protest, within 5–1/2 feet of church premises, the placing thereon of 16 smokestacks lower than the windows of the main room of the church, and the discharge into the church of smoke, cinders, steam and dust, frequently compelling the pastor to suspend his remarks, soiling the apparel of the congregation, and causing a diminution in the attendance both of the congregation and the Sunday school. We do not deny the authority of the case, but, rather, its applicability.

The trial chancellor, having heard the testimony and viewed the premises, concluded his opinion with the following observations:

"The value of the respective properties is seemingly dependent upon the industrial health of the city of Pontiac. The proposed expansion of the yard is essential to this condition. Any diminution of facilities for adjacent industrial plants or their expansion in the opinion of the court, would have a more depreciating influence upon the homes in the area than the establishment of the yard.

"The city commission as a legislative function has authorized the auxiliary yard. The proposed installation is not in violation of any restrictive covenant or zoning regulations. There is nothing in the record to indicate that the yard will be an actionable nuisance.

"It may also be pointed out that the commission has taken every precaution to avoid such a contingency. Its location next to the belt line in an industrial area could have long been foreseen as a probable contingency."

There is no merit in additional errors claimed by appellants. That portion of the agreement of May 21st reciting that the city would forego any present or future efforts to extend Stanley avenue at grade across the support yard is clearly within the legislative competence of the city commission.

We are constrained once more (cf., Brae Burn, Inc., v. City of Bloomfield Hills, 350 Mich 425) to observe that the wisdom or desirability of action by the law-making body is not before us. The ultimate power is vested in such body and, save as to constitutional restraints, its good faith in acting for the public welfare is not to be questioned by us. Likewise, we find no abuse of judicial discretion in the court's denial of the intervention as parties plaintiff, on the opening trial date, of some 50 persons whose appearance, appellants concede, "would not have altered either the pleadings or the proofs." See School District of the City of Ferndale v. Royal Oak Township School District No. 8, 293 Mich 1 (127 ALR 661).

The case before us involves a balancing of the equities of the parties in the interests of the public good. We find in the agreement under consideration a legislative recognition of the interests of the adjacent home owners and recognition of the interests of the railroad, of the shippers, and of the com-

munity itself, together with an agreed provision for the employment of the remedy of mandatory injunction in event of dereliction by the railroad. We are not persuaded of error.

The decree of the trial chancellor is affirmed. No costs, a public question.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.