NEWMAN EQUITIES v MERIDIAN CHARTER TOWNSHIP

Docket No. 248722. Submitted July 14, 2004, at Lansing. Decided
October 21, 2004, at 9:15 a.m.

Newman Equities brought an action in the Ingham Circuit Court
against Meridian Charter Township, seeking reinstatement of a
zoning change relating to the plaintiff's property from residential
use to commercial use, which change was overruled by the voters
of the township in a referendum. The plaintiff's land is within a
short distance from the Meridian Mall, a large, regional shopping
center. The court, William E. Collette, J., declared the referendum
vote void and reinstated the commercial zoning designation,
having determined that the plaintiff real estate development
partnership was correct that the referendum reversed the zoning
change on a basis that was unreasonable, arbitrary, and capricious
and, thus, unconstitutional. The township, having approved the
zoning change to commercial use, appealed nonetheless on behalf
of its resident voters in support of the result of the referendum,
i.e., returning the parcels to residential zoning from commercial
zoning.

The Court of Appeals *held*:

1. Because it is a legislative act, a zoning decision made by a
referendum vote carries the same right to deference by a reviewing
court as one made by local elected officials; the court reviewing the
decision gives every presumption of validity to the decision. The
issue of the zoning decision made by referendum did resolve a fair
or debatable question, not merely a whimsical decision. A zoning
designation for commercial use was not the only legitimate out-
come. The result of the referendum was not unreasonable, arbi-
trary, and capricious and, thus, was not unconstitutional.

2. Consistency with a comprehensive development plan is a
proper way to view a zoning change issue. Although comparison of
a zoning designation with the township's plan is one way of
analyzing which designation ought to apply, neither residential
zoning nor commercial zoning is within the plan for the subject
property. The trial court erred in considering that residential
zoning did not fit within the plan, because commercial zoning also
did not. There is room for debate and a legitimate difference of

opinion about which zoning designation better fulfilled the intent of the plan. Given that difference, the voter's decision was not unreasonable.

3. Initially, the plaintiff had agreed with other property owners in the area to pay for the construction of a road along their properties if the township decided not to fund the construction, a decision that could not have been premised on township rezoning. Any tacit agreement for commercial zoning between the township and the plaintiff, signified by acceptance of land from the developers for a road paid for by assessments on the property of the developers, could not be relied on. Similarly, any oral representations from township staff or officials could not be relied on. Any tacit agreement or official representation carries no weight in determining whether the township referendum is binding.

4. The township zoning ordinance and plan tried to buffer rural residential areas from a hard commercial core with space used for office and multifamily dwellings, in an effort to provide consistency with surrounding uses. The property at issue is between the heavily commercial core and a rural residential area. The only question presented is where to make the buffering line between commercial property and residential property. Where to draw that line is an issue open for legitimate debate and difference of opinion about whether commercial zoning or residential zoning is more consistent with the surrounding uses. The referendum vote resolved the issue and so it was not unreasonable, arbitrary, or capricious.

Reversed and remanded.

FITZGERALD, J., dissenting, stated that the trial court correctly determined that the referendum vote, although clothed with the presumption of validity, was arbitrary and did not advance any governmental interest and was, on that basis, unconstitutional as violative of the plaintiff's substantive due process rights. This decision was based on findings of fact by the trial court, which findings must be given considerable weight by this Court. The determination of a single-family residential designation being assigned by the referendum vote to the properties is inconsistent with the township's comprehensive development plan. The trial court's decision should be affirmed.

ZONING — TOWNSHIP ORDINANCES — REFERENDA.

A township's zoning ordinance is a legislative act that can be subjected to change by referendum vote, which vote should be granted the same deference by a reviewing court as the ordinance.

*Loomis, Ewert, Parsley, Davis & Gotting, P.C.* (by *Jack C. Davis, Jeffrey W. Bracken,* and *Kevin J. Roragen*), for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross* and *David K. Otis*), for the defendant.

Before: BANDSTRA, P.J., and FITZGERALD and HOEKSTRA, JJ.

BANDSTRA, P.J. This is a zoning dispute. Plaintiff, a real estate developer, donated land for, and helped pay the costs of constructing, a road to relieve traffic problems in the area east of the Meridian Mall, a regional shopping center. The parcels of plaintiff's property through which the road was constructed, as well as an adjoining parcel, were then rezoned for commercial use by defendant's township board. Shortly thereafter, the voters of defendant township reversed that rezoning through a referendum vote and the parcels at issue reverted to their previous residential zoning designations. We conclude that the trial court erred in reversing the voters' decision; there is at least a legitimate difference of opinion whether residential zoning of the subject parcels is appropriate, meaning that the voters' decision was not unreasonable, arbitrary, or capricious.

I. BACKGROUND FACTS AND PROCEEDINGS BELOW

Plaintiff Newman Equities owns various properties in the area surrounding the Meridian Mall. The mall is a large regional shopping center that serves the residents of defendant Meridian Charter Township as well as persons traveling to the complex for shopping, service, and entertainment purposes from the greater Lansing and mid-Michigan areas.

The mall is located just slightly northwest of the intersection of Marsh Road and Grand River Avenue, both of which, along with other arterial streets in the area, have become congested with excessive traffic. In the mid-1980s, a traffic study recommended that a collector road be built running eastward across Marsh and ultimately ending, to the south, at Grand River. Plaintiff and other owners of property through which this road would be built entered into a private agreement to construct the road. Their agreement included a plan by which the costs of construction would be allocated among the owners, if the township decided to not develop the road publicly and, therefore, to not use special assessments against surrounding property owners to provide funding. The township did so decide, accepted donations of property from plaintiff and the others for the roadway, and passed a resolution establishing a special assessment district to pay for development costs. The resolution reflected the same allocation of costs among the property owners as did the preceding private agreement. Plaintiff's cost for the road development, including both the value of the donated land and assessed fees, was estimated[1] at nearly $700,000.

The road that was constructed in the mid-1990s, Central Park Drive, is contiguous to or runs through two of the three parcels owned by plaintiff that are at issue here. Those parcels, referred to here as parcels 1 and 2, are the most westerly of the three and the closest to the mall and associated business development. They have little, if any, development value of their own, but would serve to provide access to parcel 3, located to

---

[1] This estimate included valuing the 1.3 acres donated in the mid-1990s at $190,000. This acreage was part of an approximately ten-acre parcel purchased by Newman in 1984 for $38,000. The prorated value of the donated 1.3 acres at that time was thus approximately $5,000.

their east and further away from the business hub of
the mall. Parcel 3 is by far the largest parcel (about
thirty acres) and offers significant development poten-
tial.

For at least a few decades and during the time
Central Park was in the planning and development
stages, all three parcels were zoned for either multifam-
ily residential (parcels 1 and 2) or single-family residen-
tial (parcel 3) uses. In 1998, plaintiff requested that the
parcels be rezoned for commercial use. This request was
approved by the township planning commission and
officially granted by the township board. However,
shortly thereafter, the voters of the township approved
a referendum issue reversing that decision. Thus, the
zoning reverted to the residential designations previ-
ously in place.

Plaintiff filed this action in the trial court, arguing
that the referendum zoning decision was unconstitu-
tional because it was unreasonable, arbitrary, and ca-
pricious. Following a four-day bench trial, the trial
court agreed and declared the result of the election null
and void, and entered an order giving full force and
effect to the decision by the township officials to zone
the property commercial. On behalf of its resident
voters, the township has appealed that decision.

## II. APPLICABLE LAW/STANDARD OF REVIEW

When a local zoning decision is challenged on consti-
tutional grounds, that decision is treated with a great
deal of deference:

> [T]his Court does not sit as a superzoning commission.
> Our laws have wisely committed to the people of a commu-
> nity themselves the determination of their municipal des-
> tiny, the degree to which the industrial may have prece-
> dence over the residential, and the areas carved out of each

to be devoted to commercial pursuits. With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community . . . and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability. [*Kropf v Sterling Hts*, 391 Mich 139, 161; 215 NW2d 179 (1974), quoting *Brae Burn, Inc v Bloomfield Hills*, 350 Mich 425, 430-431; 86 NW2d 166 (1957).]

In other words, the zoning decision comes to the courts " 'clothed with every presumption of validity,' " *Kropf, supra* at 162, quoting *Brae Burn, supra* at 432, citing *Hammond v Bloomfield Hills Bldg Inspector*, 331 Mich 551, 555; 50 NW2d 155 (1951), and " 'it is the burden of the party attacking to prove affirmatively that [it] is an arbitrary and unreasonable restriction upon the owner's use of his property' " and thus unconstitutional. *Kropf, supra* at 162, quoting *Brae Burn, supra* at 432, citing *Janesick v Detroit*, 337 Mich 549, 553; 60 NW2d 452 (1953).[2]

Further, if the zoning issue presents at least a debatable question, its resolution cannot be considered unconstitutional. "We require more than a fair difference of opinion. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit*, and that there is no room for a legitimate difference of opinion concerning its reasonableness." *Kropf, supra* at 162, quoting *Brae Burn, supra* at 432. While ordinarily these prin-

[2] The trial court noted the *Brae Burn* rule that zoning decisions enacted by referendum are entitled to a presumption of validity, but also reasoned that "[t]his Court finds that the fact that the re-zoning here was initially approved by the very body that now attempts to demonstrate that it was unreasonable is a significant factor in favor of Plaintiff." That approach improperly placed the burden of proof on the township to show that the commercial zoning of the subject parcels was unreasonable; the burden clearly rested upon plaintiff to show that the decision to zone the parcels residential was unreasonable.

ciples apply to zoning decisions made by local elected officials, they apply equally as well to zoning decisions made by voters through the referendum process. *Albright v Portage*, 188 Mich App 342, 351-352; 470 NW2d 657 (1991).[3] See *Stadle v Battle Creek Twp*, 346 Mich 64, 69; 77 NW2d 329 (1956), quoting 5 McQuillin, Municipal Corporations (3d ed), Initiative and Referendum, § 16.48, p 241 ("Municipal legislation may be enacted . . . by direct vote of the electors. The initiative and referendum are recognized as instruments of democratic government, widely used and of great value.")

We review de novo the trial court determination that the zoning decision of the voters was unconstitutional. *Kropf, supra* at 163. However, in doing so, we "give considerable weight to the findings of the trial judge," recognizing that "the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify" than we are. *Id.*, quoting *Christine Bldg Co v Troy*, 367 Mich 508, 518; 116 NW2d 816 (1962). To reverse, we must "reach the conclusion [that] we would have arrived at a differ-

---

[3] Plaintiff notes that, in *Albright*, the voters' referendum rejected a township board rezoning that had been initially denied by the planning commission and suggests that deference to a referendum zoning decision should only be afforded in such situations. However, *Albright* does not, itself, suggest such a limitation and we reject it. As noted earlier, *Kropf, supra* at 139, the people of a community have the primary right to govern its growth and its life, including through referenda on zoning questions. This right should not be limited to situations in which the majority votes of a planning commission and the township board of trustees are in conflict. As explained below, the constitutionality of a referendum zoning decision depends on the presence of a fair and legitimate difference of opinion. As this opinion demonstrates, that can be proved in a number of ways, without necessarily requiring a difference of opinion between the majority votes on a planning commission and board. Finally, we note that neither the planning commission nor the board in this case was unanimously in support of plaintiff's request that the subject parcels be rezoned "commercial."

ent result had we been in the position of the trial judge." *Kropf, supra* at 163, quoting *Christine Bldg, supra* at 518.

In sum, we must determine whether the trial court appropriately determined that the voters' referendum zoning decision, presumed to be valid, was, in fact, unreasonable, arbitrary, and capricious. More specifically, we must decide whether the zoning issue failed to present a fair or debatable question, meaning that a commercial zoning designation for plaintiff's property, and not a residential zoning designation, was the only legitimate outcome. As will be explained more fully below, we conclude that, had we been in the position of the trial judge, we would have reached the opposite conclusion and upheld the voters' referendum decision.

### III. THE PROPRIETY OF THE ZONING DECISION

As noted earlier, the trial court order declared the voters' zoning decision to be "unreasonable, arbitrary and capricious, and therefore unconstitutional."[4] In an

---

[4] This was consistent with precedents stating that a zoning decision may be successfully challenged on substantive due process grounds, *Kropf, supra* at 157, if it is "unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question" that results. *Kirk v Tyrone Twp*, 398 Mich 429, 439; 247 NW2d 848 (1976), quoting *Kropf, supra* at 158. These precedents also allow a challenge if "there is no reasonable governmental interest being advanced" by the zoning classification challenged. *Kirk, supra* at 439, quoting *Kropf, supra* at 158. Although these two challenges appear separate and distinct, our Supreme Court has most recently articulated only the failure to advance a reasonable governmental interest challenge, perhaps suggesting that this is conceptually the same as a challenge on a ground of arbitrariness, unreasonableness, or capriciousness. See *Adams Outdoor Advertising v East Lansing (After Remand)*, 463 Mich 17, 23; 614 NW2d 634 (2000), citing *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 576; 575 NW2d 531 (1998). In any event, the parties, as well as the trial court, agree that, here, the facts that are pertinent to each of the standards apply equally

accompanying written opinion, the trial court analyzed the considerations that led to that conclusion, each of which the township contests on appeal.

## A. THE "TACIT AGREEMENT"

The trial court determined that there was a "tacit agreement" between plaintiff's principals and the township (officials and staff) that plaintiff "would be able to make some reasonable commercial use of the three parcels of its property in return for the huge expenditure" plaintiff made in developing Central Park. The trial court apparently reasoned that the voters' decision, in contravention of that tacit agreement, was thus unreasonable, arbitrary, and capricious. We disagree.

Initially, as a matter of law, oral representations by individual township staff or officials, such as those

as well to the other. In other words, the facts, discussed below, are equally applicable to a determination whether the voters' zoning decision here advanced a reasonable governmental interest and to a determination whether that decision was unreasonable, arbitrary, and capricious.

A zoning decision may also be challenged on constitutional grounds if it is a confiscatory taking under the Fifth Amendment. See *Adams, supra* at 23-24. Although plaintiff presented some argument and evidence to the trial court regarding the "market feasibility" of a specific fifty-four lot residential plan for parcel 3, it did not present appraisal evidence of the value of the subject parcels under the two competing zoning schemes at issue here, as is necessary to support a taking analysis. See *K & K, supra* at 587-588. The market feasibility study only analyzed whether plaintiff could realize a reasonable profit on the sale of the proposed fifty-four lot development, considering the costs associated with developing the Central Park access to the parcel and the lots themselves. Such an analysis is generally insufficient to support a taking claim. *Paragon Properties Co v Novi*, 452 Mich 568, 579 n 13; 550 NW2d 772 (1996). Further, the facts here did not demonstrate that plaintiff could not achieve any profit from developing parcel 3 with a single-family residential project. The market feasibility study assumed a profit to plaintiff on the donated roadway acreage, see n 1, and on each lot sold. The trial court appropriately did not conclude that the zoning scheme imposed through the voter referendum was confiscatory.

alleged by plaintiff, are not binding. *Nickola v Grand Blanc Twp*, 394 Mich 589, 596 n 1; 232 NW2d 604 (1975) (opinion by WILLIAMS, J.). Probably in recognition of that, plaintiff does not specifically argue on appeal that the voters' referendum decision was contrary to any tacit agreement it had with the township.

Further, the facts do not support that determination. First, both Martha Mertz and Roger Drobney, plaintiff's principals, had extensive experience in real estate development and would not likely have relied on oral representations regarding future official township decisions. Second, as noted earlier, plaintiff and other property owners in the area agreed to develop Central Park privately, if that became necessary. That plan, not involving the township, could certainly not have been premised on a township commitment to rezone the subject parcels for commercial use.

Further, the 1998 request for rezoning that led to this litigation was not the first request made by plaintiff regarding the subject parcels. Previously, in a 1994 request later withdrawn, plaintiff had asked that parcel 3 be rezoned for office and multifamily residential use, not for commercial use. Mertz testified that, at the time, she considered that rezoning sufficient to justify the cost of plaintiff's participation in the development of Central Park. Thus, the 1994 request belies any argument that there had previously been a tacit agreement for a commercial zoning designation, in return for assistance with the road development.[5]

---

[5] We note that plaintiff's 1994 rezoning request was more consistent with both the comprehensive development plan and surrounding uses than was the zoning scheme the voters ultimately rejected. Although we make no general comment on the propriety of plaintiff renewing its 1994 rezoning request or some similar plan, we note that nothing in our decision today would prevent that approach.

Plaintiff relies on language in the special assessment resolutions passed by the township to secure funding from plaintiff and other property owners for road construction costs. However, that language merely stated vaguely that the "revised special assessments are in proportion to the benefits to be derived from said project." While that may arguably suggest a commitment to allow more intense use of surrounding properties than was allowed under existing residential designations, it is certainly no clear commitment to commercial zoning. Further, by their terms, the resolutions only applied to properties within the special assessment district they established. Parcels 1 and 2 were included, but plaintiff was successful in excluding parcel 3. Thus, while plaintiff might argue that the language of the resolution supports a tacit agreement regarding parcels 1 and 2, the resolutions do not apply to parcel 3, the largest and most ideal for development among the three parcels.

The trial court reasoned that, as an experienced developer, plaintiff would not have participated in the construction of Central Park without some assurance of commercial zoning for the three parcels at issue here. However, there were reasons for plaintiff to want Central Park in place, apart from the development of those parcels. For example, the record shows that plaintiff owns (or owned) other commercial properties along Central Park that derive benefits from that roadway. Further, with respect to the parcels at issue here, plaintiff may well have presumed that some more intensive use would be forthcoming, but there is no record establishing that a rezoning from residential to commercial was the expected result.

B. CONSISTENCY WITH THE COMPREHENSIVE DEVELOPMENT PLAN (CDP)

There was extensive testimony at trial regarding the CDP for the township, and the trial court correctly

concluded that parcels 1 and 2 were designated in the CDP, at least in part, for office use. Further, the trial court correctly determined that the area east of Central Park, including parcel 3, was designated in the CDP for multiple family residential use, with 3.5 to 8 dwelling units per acre. As a result of the referendum decision, the majority of the property at issue here reverted to single-family residential zoning, a zoning that is inconsistent with the CDP. The trial court reasoned that this inconsistency supports the conclusion that the voters' decision was arbitrary, unreasonable, and capricious.

The trial court properly considered the consistency between the zoning scheme and the CDP in this regard. See *Selective Group, Inc v Farmington Hills*, 180 Mich App 595, 604-605; 447 NW2d 817 (1989). However, the voters' decision here was twofold, to reject the commercial zoning of the subject parcels and to have them revert to their previous residential designations. Thus, both the zoning imposed by the referendum and the zoning it rejected must be compared with the CDP for a complete and fair analysis of this factor. Neither the zoning scheme approved by the township board (commercial) nor the scheme that reverted into place following the voters' referendum (residential) was consistent with the CDP. As the trial court reasoned, the CDP called for "more intensive development than single family" and, for most of the property at issue here, the single-family zoning designation was noncompliant. But, on the other hand, the CDP called for office use and multifamily residential use for the subject parcels, not the more intensive commercial use that the rezoning by the township board put into place.

We conclude that the relative conformity between the two zoning schemes and the CDP was certainly a debatable question on which there could be fair differ-

ences of opinion. *Kropf, supra* at 162, quoting *Brae Burn, supra* at 432. With respect to parcel 3, the voters resolved the question in favor of single-family residential zoning (a use less intensive than the multifamily residential zoning largely called for by the CDP) rather than allowing commercial zoning, (a use more intensive than that called for by the CDP) to stand. We cannot conclude that the voters' decision in this regard was unreasonable, arbitrary, or capricious. *Kropf, supra* at 161-162, quoting *Brae Burn, supra* at 431-432.

In addition, apart from specific zoning classifications, the township's CDP is based on concepts of "transitional zoning" or "concentric zoning." In short, the CDP is premised on the notion that a central commercial area such as the mall should ordinarily be "buffered" from uses surrounding it by successively less intensive zoning categories. Specifically, the CDP envisions, in general terms, that commercial zoning areas will be surrounded by office areas, then multifamily residential, then single-family residential and, finally, rural residential designations.

In this regard, the trial court noted that the zoning scheme resulting from the referendum placed a residential area directly up against "the harsh commercial core" of the mall area, without any buffer area. Again, while that zoning scheme is inconsistent with the CDP's "transitional zoning" approach, so is the zoning scheme enacted by the township board. That scheme also extended commercial zoning almost directly up against a strip of lots zoned for single-family residences. Further, those lots were the only "buffer" between that commercial zoning and an area zoned for rural residential, the least intensive use within the township's zoning scheme. Again, there was at least room for debate and a legitimate difference of opinion about which

scheme better fulfilled the CDP in this regard, and the voters' decision against plaintiff's interests was not unreasonable, arbitrary, or capricious.

Finally, the CDP contemplated the development of "walkable" communities, i.e., those in which residential zones are near commercial zones so that people can walk from their homes to local places of business. There was testimony about other places in the township and surrounding areas where the juxtaposition of residential and commercial zoning had succeeded in promoting more walkable communities. The trial court recognized that goal as worthwhile, but opined that, in the area of the mall, traffic congestion simply made that approach an impossibility.

We recognize that, as the trial court noted, the mall area and the congestion surrounding this regional hub are somewhat unusual. Nonetheless, whether the mall area could ever become a more walkable community is, again, an open question for legitimate debate. The implied support for that approach expressed by the voters' zoning decision here was not unreasonable, arbitrary, or capricious.

### C. INCONSISTENCY WITH SURROUNDING USES

On appeal, plaintiff argues that zoning the subject parcels residential is inconsistent with surrounding uses and the general development of the area. While such an analysis is warranted, see, generally, *Troy Campus v Troy*, 132 Mich App 441; 349 NW2d 177 (1984), the facts here do not establish that the zoning scheme resulting from the voters' referendum was so inconsistent with surrounding uses that its imposition was arbitrary, unreasonable, or capricious.

The overriding issue in this case is where to draw the eastern boundary of commercial development extend-

ing from the mall. No one disputes that, to the west of the subject parcels, the mall and surrounding properties constitute a regional commercial hub. No one disputes, on the other hand, that the area east of the subject parcels will remain designated rural residential at least for the foreseeable future. The issue is whether the commercial/residential line should be drawn east of the subject parcels, meaning they would be zoned commercial, or west of them along Central Park, meaning they would be zoned residential.[6]

In deciding this question, the record suggests that the uses of surrounding properties and their development simply present no clear pattern. Testimony from township zoning officials established that, generally, commercial zoning requests for property east of Central Park have been denied. However, there is certainly commercial development east of the Central Park line, most notably a large discount department store to the north of the subject parcels. On the other hand again, there are also parcels of property zoned single-family residential east of Central Park, surrounding and sometimes contiguous to the subject parcels. A fair summary would be that the area is generally a patchwork of uses with Central Park serving, at best, as a very vague dividing line between business (commercial and office) and residential uses.

To state this another way, there was certainly room for legitimate debate and difference of opinion about whether zoning the subject parcels for commercial or residential use was more consistent with these sur-

---

[6] In this regard, the trial court stated that the decision long ago to have a regional shopping center has "become embedded in the fabric of this area," meaning that plaintiff's property "should be considered as commercial." That begs the question presented, i.e., where specifically the boundary of the intensive commercial development around the mall should be located.

rounding uses and development. Again, affording the referendum decision the deference we must, we cannot conclude that the residential zoning scheme imposed against plaintiff is unreasonable, arbitrary, or capricious.[7]

### D. CONCLUSION

The extensive record in this case presents both parties' ample arguments for their positions on the best zoning designation for the subject parcels. Our opinion today illustrates that there is certainly room for a legitimate difference of opinion and a valid debate. The voters, through the referendum, have resolved the issue and we must defer to their judgment.

We reverse and remand for entry of an order consistent with this opinion. We do not retain jurisdiction. No costs should be imposed, a public question having been presented.

HOEKSTRA, J., concurred.

FITZGERALD, J. (*dissenting*). I respectfully disagree with the majority's conclusion that the trial court erred in reversing the voters' decision in this zoning dispute.

The land at issue consists of three parcels comprised of approximately forty acres near the commercial center of the township. Following the recommendation of the township planning commission, the township board passed an ordinance changing the zoning from residential to commercial. Township voters defeated the rezoning in a referendum, returning the only readily devel-

---

[7] Evidence presented regarding the market feasibility of developing parcel 3 for single-family residential use related to plaintiff's unsuccessful taking argument, see n 4, not to the argument that the referendum decision was unreasonable, arbitrary, and capricious.

opable portion of the land to single-family residential zoning. Plaintiff sued to nullify the referendum on the ground that its substantive due process rights were violated and that the postreferendum zoning amounted to a confiscatory taking. The trial court voided the referendum and ordered defendant to restore the commercial zoning.

Defendant argues that the trial court gave insufficient deference to the referendum result. Referenda disapproving zoning legislation are themselves legislative acts, *Stadle v Battle Creek Twp,* 346 Mich 64, 69; 77 NW2d 329 (1956), which are entitled to deference from reviewing courts. *Kropf v Sterling Hts,* 391 Mich 139, 162; 215 NW2d 179 (1974). But the fact that the zoning was imposed by a referendum "does not preclude a finding that the resulting zoning classification was unconstitutional . . . ." *Poirier v Grand Blanc Twp,* 167 Mich App 770, 777; 423 NW2d 351 (1988).

The court found that the referendum result, which overturned the actions taken by defendant's planning commission and township board, was arbitrary and did not advance any legitimate governmental interest. A zoning ordinance is clothed with the presumption of validity. *Kirk v Tyrone Twp,* 398 Mich 429, 439; 247 NW2d 848 (1976). Nonetheless, a citizen "may be denied substantive due process by [a] city or municipality by the enactment of . . . a zoning ordinance, which has, in the final analysis, no reasonable basis for its very existence." *Kropf, supra* at 157.

> In looking at [the] "reasonableness" requirement for a zoning ordinance, this Court will bear in mind that a challenge on due process grounds contains a two-fold argument; first, that there is no reasonable governmental interest being advanced by the present zoning classification, or secondly, that an ordinance may be unreasonable because of purely arbitrary, capricious and unfounded

exclusion of other types of legitimate land use from the
area in question. [*Id.* at 158.]

This Court will give " 'considerable weight' " to the
findings of the trial court. *Kirk, supra* at 439-440
(citation omitted). Referenda disapproving zoning leg-
islation are themselves legislative acts, *Stadle, supra* at
69, that are entitled to deference from reviewing courts.
*Kropf, supra* at 162.

The evidence supports the trial court's finding that
the postreferendum zoning of parcel 3 as single-family
residential is inconsistent with defendant's comprehen-
sive development plan (CDP). The former head of
defendant's planning commission testified that single-
family residential zoning was inappropriate for the area
that included plaintiff's property. The court also con-
cluded that while the goal of creating a "walkable
community" in the vicinity of the township's commer-
cial core was a good and worthwhile concept, the goal
was unrealistic given the expanding nature of the
commercial core. The court also rejected the contention
that the zoning of plaintiff's property would further the
goal of creating a buffer zone between commercial and
noncommercial land use. Additionally, the court found
defendant's expert testimony that plaintiff could "rea-
sonably develop" the property and "receive an eco-
nomic" return to be "incredible and unbelievable."

Giving the proper weight to the findings of the court,
I conclude that the trial court did not err in concluding
that the postreferendum zoning of plaintiff's property is
arbitrary and capricious. The testimony and documen-
tary evidence presented belies the contention that the
present zoning of plaintiff's property comports with the
way the surrounding area has been developed. Further,
plaintiff invested, with defendant's encouragement,
nearly $700,000 in building a four-line primary arterial

road to help relieve congestion in the township's commercial core. The trial court properly concluded that defendant cannot now "avoid the inevitable result of its actions." I would affirm the decision of the trial court.