KRAUSE *v.* CITY OF ROYAL OAK.

OPINION OF THE COURT.

1. ZONING—ORDINANCE—VALIDITY—POLICE POWER.

A zoning ordinance, to be valid, must bear a direct and substantial relation to the objectives of police power, the preservation of the public health, safety, morals, and general welfare of the community as a whole.

2. SAME—ORDINANCE—BURDEN OF PROVING INVALIDITY.

The party attacking a zoning ordinance has the burden of establishing affirmatively that the ordinance has no real or substantial relation to public health, morals, safety, or general welfare.

3. SAME—ORDINANCE—VALIDITY—PRESUMPTIONS.

A zoning ordinance is presumed valid and the burden is on the party attacking the ordinance to overcome the presumption by clear and satisfactory proof.

4. SAME—ORDINANCE—VALIDITY—VALUE FOR DIFFERENT USE.

The fact that land may have a greater selling value for a possible use of a different character than that for which it is zoned is not a sufficient basis for holding the ordinance invalid as applied to such property, although it is a matter to be considered with other elements affecting the situation.

5. SAME—ORDINANCE—DISPARITY OF VALUATIONS.

Disparity of valuations of property due to zoning are accompanied by the other factors which clearly affect the public health, safety, or general welfare of the people in cases where the zoning ordinances are held to be invalid.

REFERENCES FOR POINTS IN HEADNOTES

[1, 5] 58 Am Jur, Zoning § 18.
[2, 3, 8] 58 Am Jur, Zoning § 16.
[4] 58 Am Jur, Zoning § 146.
[6, 7, 10–13] 58 Am Jur, Zoning §§ 21, 22.
[9] 5 Am Jur 2d, Appeal and Error § 1009.
[14–16] 5 Am Jur 2d, Appeal and Error § 841.
[17] 58 Am Jur, Zoning §§ 231, 232.

6. Same—Unreasonable and Arbitrary Exercise of Police Power.
   Conclusion by trial court that 1-family zoning classification, as
   it applied to property bordering railroad tracks, was void
   because it constituted an unreasonable and arbitrary exercise
   of the police power of the city and was confiscatory in that
   it deprived the plaintiffs of their property without due process
   of law, where testimony indicated that the marketability of
   property for 1-family residences was impaired by the presence
   of the railroad *held*, improper, where there is no evidence
   that the difference in value has any bearing on the improper
   use of the police power, and the ordinance was enacted to
   avoid a situation where the building of apartment house
   results in destroying an entire section for single-family
   housing purposes.

7. Same—Similar Property.
   City's zoning practice in rezoning a triangular-shaped parcel
   of property, similar to property in action to declare zoning
   ordinance invalid, situated next to a railroad and directly
   northwest of the subject property was not arbitrary and
   capricious when there were no existing 1-family houses on
   the rezoned land as there were on the subject property.

8. Same—Ordinance—Application to Particular Tract.
   Evidence presenting no more than a debatable question does
   not rebut the presumption of validity of a zoning ordinance.

9. Costs—Public Question—Zoning Ordinance.
   No costs are allowed on appeal from trial court judgment in
   which 1-family zoning was declared invalid as to property
   bordering on railroad tracks, a public question being involved.

Dissenting Opinion.

Levin, P. J.

10. Zoning—Ordinance—Unreasonable Application.
    *A zoning ordinance may be reasonable in the sense that it bears
    a substantial relationship to public health, morals, safety, or
    general welfare, but may still be unreasonable in its applica-
    tion to particular property if that property cannot reasonably
    be used as zoned.*

11. Same—Reasonable Use—Validity.
    *Zoning which prevents any reasonable use of property is con-
    fiscatory and, for that reason, invalid.*

12. SAME—ORDINANCE—DEBATABLE QUESTION RULE—APPLICATION.
   *Zoning is not irrational and therefore invalid if, on the evidence presented, its rationality remains debatable.*

13. SAME—DEBATABLE QUESTION.
   *The debatable question rule is not applicable where the question presented is whether the zoning is unreasonable because it is confiscatory, which is more a question of fact than of judgment.*

14. APPEAL AND ERROR—FINDINGS OF FACT—CLEARLY ERRONEOUS RULE.
   *Findings of fact shall not be set aside by an appellate court, in equity as well as in nonjury law cases, unless clearly erroneous and regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it (GCR 1963, 517.1).*

15. SAME—FINDING OF FACT—CLEARLY ERRONEOUS.
   *A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.*

16. ZONING—VALIDITY—EVIDENCE.
   *Adoption by trial judge of testimony offered in behalf of plaintiff landowners in preference to testimony offered in behalf of the defendant city presents no reason to reject his evaluation of the conflicting testimony where he concluded it would be so difficult to find a land developer or housebuilder willing to speculate in the improvement of land bordering railroad tracks and multiple housing development, in preference to land which does not have the location disadvantages of this land, that the land was not suitable for development with single family residences, and that the zoning in controversy was confiscatory.*

17. SAME—SPECULATIVE POSSIBILITIES—PRESENT USE.
   *A judicial inquiry into the validity of a zoning ordinance is not concerned with speculative possibilities of the property but rather seeks to determine whether it can now be reasonably used as now zoned.*

Appeal from Oakland; Adams (Clark J.), J.  Submitted Division 2 February 10, 1967, at Detroit. (Docket No. 1,399.)  Decided April 25, 1968.

Complaint by Harold C. Krause, Ethel E. Krause, Lilian Cloutier, Richard Cloutier, E. L. Pardington, Mary Roberts, Ethel M. Bogart, and Mildred Varga against the City of Royal Oak, a municipal corporation, to have the zoning ordinances of defendant, as they apply to plaintiffs' property, declared void. Judgment restraining defendant from enforcing the zoning ordinance. Defendant appeals. Judgment vacated.

*Hudson & Hudson,* for plaintiffs.

*Allan G. Hertler,* for defendant.

BURNS, J. The city of Royal Oak appeals from a judgment restraining it from enforcing a zoning ordinance which places plaintiffs' property in a one-family residential use classification. The judgment permits. plaintiffs to use their land for multiple-family residential purposes.

Plaintiffs' property is located in the city of Royal Oak and consists of approximately 3.5 acres of land, which, for purposes of this opinion, can be described in terms of a geometrically imperfect right triangle. The Grand Trunk Western railroad, which is elevated and runs in a northwesterly and southeasterly direction, forms the hypotenuse of this triangle. Starr road, which runs roughly east and west, provides a southern base for the triangle. The remaining part of the triangle, the western border of plaintiffs' property, is composed of one lot which fronts on the north side of Starr road and other lots which front on the east side of Benjamin avenue, a north-south thoroughfare. Within this area are 14 subdivided lots surrounding a 350-foot, undeveloped cul-de-sac.

The territory bounded by the railroad, Starr road and Benjamin avenue has been zoned for one-family residential use since 1957. Other than one nonconforming 3-family multiple dwelling, which was erected prior to 1957 when multiple dwellings were permissible, the east side of Benjamin avenue and the first 2 lots on the north side of Starr avenue, east of Benjamin, are developed with single-family residences. Located upon the subject property itself are 2 comparatively old one-family homes which, all parties agree, will be removed for purposes of re-platting, regardless of the course of future development.

The neighborhood surrounding the area bounded by Starr road, Benjamin avenue and the railroad is of a mixed character. The Royal Oak municipal golf course is on the west side of Benjamin (across the street from the lots which back up to the subject property). The area north and east of the railroad is zoned for one-family residences, and improvements exist on a number of those lots. The property south of Starr road is zoned for and has been developed with multiple-family dwellings. This property also fronts upon heavily travelled 13 Mile road which is exclusively bounded by multiple-family complexes from the Grand Trunk Western railroad tracks west to one of the main arteries of the Detroit metropolitan area, Woodward avenue (US-10), where nonresidential uses are permitted.

Since 1961 owners of part of the subject property have made unsuccessful applications for a zoning change, but it was not until 1966 that plaintiffs commenced this action to enjoin the defendant from enforcing the zoning ordinance as it affects their land. The trial judge listened to the proofs, viewed the premises, and held that the one-family zoning classification was void because it constituted an unreason-

able and arbitrary exercise of the police power of the city of Royal Oak and was confiscatory in that it deprived plaintiffs of their property without due process of law.

Our review of this judgment is guided by certain elementary principles which have been concisely set forth in *Alderton* v. *City of Saginaw* (1962), 367 Mich 28, 33:

"We have held that a zoning ordinance to be valid must bear a direct and substantial relation to the objectives of police power, the preservation of the public health, safety, morals, and general welfare, of the community as a whole (*Long* v. *City of Highland Park* [1950], 329 Mich 146); that the attacking party has the burden of establishing affirmatively that the ordinance has no real or substantial relation to public health, morals, safety, or general welfare and that the ordinance is presumed valid (*Austin* v. *Older* [1938], 283 Mich 667); that each case must be determined on its own facts and circumstances (*Moreland* v. *Armstrong* [1941], 297 Mich 32), and that in order for the courts to find action of the legislative body invalid, more than a debatable question is required (*Brae Burn, Inc.,* v. *Bloomfield Hills* [1957], 350 Mich 425)."

The propositions that an "ordinance is presumed valid" and that it is plaintiff's burden to overcome that presumption "by clear and satisfactory proof"[1] are of critical importance in this case. The public purposes which plaintiffs are required by the presumption to confute in this case are best enumerated in CL 1948, § 125.583 (Stat Ann 1958 Rev § 5.2933) where the legislature said:

"The legislative body of cities and villages may limit and restrict the maximum number of families

---

[1] See *Paka Corporation* v. *City of Jackson* (1961), 364 Mich 122, 128; and *Township of Farmington* v. *Scott* (1965), 374 Mich 536, 541, 542.

which may be housed in dwellings hereafter erected
or altered, and for such purposes divide any city or
village into districts of such number, shape and area
as may be deemed best suited to carry out the pur-
poses of this section.   Such regulations shall be uni-
form throughout any specified district, but may dif-
fer from the regulations adopted for other districts.
*Such regulations shall be designed to limit the over-
crowding of land, to avoid undue congestion of popu-
lation, to facilitate adequate provision for a system
of transportation, sewage disposal, water, education,
recreation and other public requirements, and to
promote public health, safety and general welfare.*"
(Emphasis supplied.)

To place this case in its proper perspective, we
should note that plaintiff did not claim that any de-
preciation in property value resulted from the adop-
tion of the zoning ordinance imposing the restriction
to which the property was not previously subject.
Rather, it appears that the essence of plaintiffs' ob-
jection is that their land should be freed of the re-
striction imposed by the ordinance of 1957 to the end
that they might have the benefit of appreciated
value.   Although one witness, a home builder tes-
tifying on behalf of plaintiffs, stated the land was
unsuited for single-residential use, another one of
the plaintiffs' witnesses, an appraiser who was more
familiar with property values, testified that the land
was not without value as zoned but that it would be
more valuable for multiple-family use.   Defendant
conceded that such was the case but disputed the
ratio of difference in valuations as computed by
plaintiffs' witnesses.

According to the plaintiffs' witnesses, the market-
ability of the property for one-family residences
was impaired by the presence of the railroad.   The
proximity of the tracks to the lots made it impossi-
ble to obtain Federal Housing Administration financ-

ing, thereby eliminating a good percentage of prospective buyers who could not secure Veterans Administration or conventional loans. In addition, plaintiffs' witnesses pointed out the undesirability of constructing one-family residences next to a railroad because of the vibration, noise, possible danger to children, and the smell. Yet, by plaintiffs' proposal to build multiple dwellings (40 one-bed units and 40 two-bed units) they would invite many more persons (than the 14 one-family houses would accommodate) to share in this feigned misery. The alleged adverse effect the railroad may have on marketability of single-family homes is at best dubious because of plaintiffs' own appraiser's acknowledgment upon cross-examination that a number of single-family homes in Royal Oak lie adjacent to the railroad although these areas located next to the tracks have been the last to develop for residential purposes. The proximity of a railroad does not render zoning for one-family residential purposes arbitrary and unreasonable. See *City of Hillsdale* v. *Hillsdale Iron & Metal Company, Inc.* (1960), 358 Mich 377.

This is not to say, however, that the value of the property and the effect, if any, a railroad has on that value, plays no role in our deliberations. The Supreme Court of Michigan has repeatedly recognized that "the mere fact that land may have a greater selling value for a possible use of different character than that for which it is zoned is not a sufficient basis for holding the ordinance invalid, as applied to such property, although, of course, it is a matter to be considered with other elements affecting the situation." *Paka Corporation* v. *City of Jackson* (1961), 364 Mich 122, 127; *Smith* v. *Village of Wood Creek Farms* (1963), 371 Mich 127.

The disparity of valuations in the cases cited by the plaintiffs wherein zoning ordinances have been held for naught are invariably accompanied by other factors which clearly affect the public health, safety or general welfare of the people. For instance, in *Smith* v. *Village of Wood Creek Farms, supra,* the disparity of value of 3 lots and the presence of 2 busy highways and nearby commercial locations were sufficient to invalidate an ordinance restricting those lots to residential purposes, whereas the disparity of value of a fourth lot, which was bordered on but one side by a highway, was insufficient to negate the zoning ordinance.

In the present case the difference in value is accompanied by no convincing evidence bearing on the improper use of the police power. The most positive evidence tendered by plaintiffs was the testimony of the city's planning director who said that no question of public health is involved. Other than this, plaintiffs' proofs fail to adequately cope with most of the public interest considerations which we must assume prompted the adoption of the zoning ordinance.

In this respect, however, there was some testimony introduced regarding the impact that a multiple dwelling development would have upon the people whose backyards abut the subject property. During plaintiffs' case in chief, plaintiffs' appraiser testified that the presence of multiple dwellings would have no adverse effect on the immediate neighborhood, but the adverse effect to which he referred was in terms of price not people. Plaintiffs' home building witness also testified as to this problem, but his concept of adverse effect was his personal opinion of whether or not he would purchase a house completely surrounded with multiple dwellings. Both of plaintiffs' witnesses who spoke on this issue ap-

proached the problem as one of basic economics. Contrary to this dollars and cents approach, we have the defendant's planning director's testimony which probably explains a portion of the rationale for having the subject property zoned as it is:

"*Q*. [*Counsel for defendant*] In your professional opinion, as a person who works in the field of zoning and community planning, does the existing one-family zoning of the subject property tend to promote the public peace, safety and general welfare?

"*A*. [*City planning director*] In my opinion it does, yes.

"*Q*. Will you tell us why?

"*A*. Well, I might preface my comments to the fact that in this specific area the public involved would be the public that would be in the triangle for the immediate vicinity of the lots in question. This would be from 13 Mile road on the south, Benjamin on the west, and essentially the Grand Trunk on the easterly boundary. They would be the immediate public involved. The area is predominantly single-family north of Starr road and these people would be forced to experience the increased confusion and congestion, noise, *et cetera* that would accompany a development other than single-family, a development that would allow a drastic increase in the total number of people that would live in the three acres more or less in question. The single-family zoning in the area would promote a 13-family development, at least 13 families, would generate at best 26 cars so there would not be a traffic problem coming into or off of Benjamin from Starr road. Also the nature of the residential amenities that accrue to other residential properties from single-family developments would tend to go along with the type of development that is already north of Starr road. Also, we feel that this type of zoning does allow for the natural growth of single-family development with the schools and the other residential amenities [which] are in the area. * * *

"*Q.* Mr. Bowman, as a professional in the field of planning and zoning, what is your opinion as to the comparative desirability of having multiple-family residences back up to single-family residences, compared to facing multiple-family to single-family with a street in between, sir?

"*A.* Well, it's my opinion, based upon the experiences we have had in the recent past, over the past 2 or 3 years, with the rapid development of apartments in Royal Oak and in our surrounding communities, that due to the general demand of the occupants of apartments for parking, for the use of a swimming pool, other recreational facilities, the high density of people living in these developments, that it is far better to face the apartment development across a street which is 50 or 60 feet in width to the single-family development rather than having it abut to the rear yards where all of the service parking and all of the congestion takes place; that we have found that we have more and more of our abutting property owners object where it is a rear yard situation rather than a face to face situation."

We think it is fair to conclude, therefore, that the municipal authority enacting this ordinance was trying to avoid the situation described in *Euclid* v. *Ambler Realty Company* (1926), 272 US 365, 394, 395 (47 S Ct 114, 120, 121, 71 L Ed 303, 313, 314, 54 ALR 1016) where Justice Sutherland said:

"With particular reference to apartment houses, it is pointed out that the development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by

their height and bulk with the free circulation of
air and monopolizing the rays of the sun which other-
wise would fall upon the smaller homes, and bring-
ing, as their necessary accompaniments, the disturb-
ing noises incident to increased traffic and business,
and the occupation, by means of moving and parked
automobiles, of larger portions of the streets, thus
detracting from their safety and depriving children
of the privilege of quiet and open spaces for play,
enjoyed by those in more favored localities,—until,
finally, the residential character of the neighborhood
and its desirability as a place of detached residences
are utterly destroyed. Under these circumstances,
apartment houses, which in a different environment
would be not entirely unobjectionable but highly de-
sirable, come very near to being nuisances."

Not to be overlooked is plaintiffs' evidence which,
we surmise, was directed to the claim that the city's
zoning practice in this instance was arbitrary and
capricious. In 1964 a triangular-shaped parcel of
property, which is also situated next to the Grand
Trunk Western railroad and directly northwest of
the subject property, was rezoned from one-family
to multiple-family residential. We gather from the
city planning director's testimony, however, that
there were no existing one-family houses on the
rezoned land and there are on the subject property.
Furthermore, it is important to note that the area
catercorner from this parcel is zoned for heavy in-
dustry purposes and that it is bordered predomi-
nantly with multiple-family or nonresidential zoning
classifications. The 1964 rezoning was completely
reasonable in our opinion and bears no relation to
the alleged unreasonable characterization of plain-
tiffs' property.

Plaintiffs' case, amounting to substantially nothing
more than a partial deprivation of the best eco-
nomic use of their property, does not persuade us

to subvert the interests of the public as expressed by the legislative body which enacted the zoning ordinance in question. The evidence introduced by plaintiffs is alarmingly insufficient to rebut the ordinance's presumption of validity. At best, plaintiffs' evidence presents nothing more than a debatable question.

Judgment vacated. No costs, a public question being involved.

McGREGOR, J., concurred with BURNS, J.

LEVIN, P. J. (*dissenting*). The plaintiffs challenged their property's present zoning both on the ground that it bears no substantial relationship to public health, morals, safety, or general welfare and on the ground that it deprives the property of any reasonable use. Holding for the plaintiffs on both grounds, the trial judge found the zoning both irrational and confiscatory.

Concluding that at best plaintiffs' evidence presented nothing more than a "debatable question" on the rationality of present zoning, the majority reverses the trial judge. However, even if zoning is entirely reasonable in the sense it bears a substantial relationship to public health, morals, safety, or general welfare,[1] it may nonetheless be unreasonable in its application to particular property if that property cannot reasonably be used as zoned.[2] Zoning which prevents any reasonable use of property is confiscatory and, for that reason, invalid.

---

[1] See, *e. g.*, *Sisters of Bon Secours Hospital* v. *City of Grosse Pointe* (1967), 8 Mich App 342, 349.

[2] *Ervin Acceptance Company* v. *City of Ann Arbor* (1948), 322 Mich 404, 408; *McGiverin* v. *City of Huntington Woods* (1955), 343 Mich 413, 419; *Bassey* v. *City of Huntington Woods* (1956), 344 Mich 701, 704; *Pere Marquette Railway Co.* v. *Muskegon Township Board* (1941), 298 Mich 31, 37; *Grand Trunk Western Railroad Company* v. *City of Detroit* (1949), 326 Mich 387, 392; *Frendo* v. *Township of Southfield* (1957), 349 Mich 693, 698.

While the trial judge and we must find for the municipality if we find there is a debatable question concerning the rationality of the zoning, *i.e.*, zoning is not irrational if, on the evidence presented, its rationality remains debatable,[3] a "debatable question" rule has not been established where the question presented is whether the zoning is unreasonable because it is confiscatory.[4] Whether zoning is confiscatory is more a question of fact than of judgment. That fact may be proved like any other fact. It is not necessary for one claiming confiscation to prove it beyond dispute.

The evidence presented here concerning the confiscation issue was in conflict. The trial judge correctly went about resolving that factual dispute in the same manner he would approach decision of any disputed factual issue in a case tried by him. Merely because all reasonable men would not necessarily have reached the same decision did not oblige the trial judge to decide the issue of confiscation for the municipality.

Although the plaintiffs seek equitable relief, we have no greater freedom to ignore the trial judge's findings of fact in this case than in a "law" case tried without a jury. In all cases, law and equity,[5] tried

---

[3] *Brae Burn, Inc.*, v. *City of Bloomfield Hills* (1957), 350 Mich 425, 433.

[4] In *Brae Burn, Inc.*, v. *Bloomfield Hills, supra*, p 434, the Court said: "*It must be stressed that we are not*, on this record (as we pointed out in *Anderson* v. *City of Holland*, 344 Mich 706, 710) '*dealing with a situation in which the property involved is unsuitable for residential purposes and has little or no value if so restricted.*'" (Emphasis supplied.) See, also, *Alderton* v. *City of Saginaw* (1962), 367 Mich 28, 33, where the Court observed: "The debatable question rule as presented in *Brae Burn, supra*, does not mean such question exists merely because there is a difference of opinion between the zoning authority and the property owner in regard to the validity of the ordinance. If this were the case, no ordinance could ever be successfully attacked."

[5] See GCR 1963, 11: "These rules govern the practice in the circuit courts * * * the Court of Appeals, and the Supreme Court, in actions of a civil nature *whether heretofore cognizable as*

without a jury, we apply the same reviewing standard, the "clearly erroneous" standard. GCR 1963, 517.1 cautions us that in the application of the principle that findings of fact shall not be set aside unless clearly erroneous, "regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it." We are advised[6] that the very same standard was in fact applied in reviewing chancery cases prior to the effectiveness of Rule 517.

The phrase "clearly erroneous" was borrowed from Fed Rules Civ Proc 52(a). The court that promulgated that standard explained it in these terms:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the *definite and firm conviction* that a mistake has been committed." *United States* v. *United States Gypsum Co.* (1948), 333 US 364, 395 (68 S Ct 525, 542, 92 L Ed 746, 766),

---

*actions at law or in equity.*" See, also, 2 Honigman and Hawkins, Michigan Court Rules Annotated (2d ed), authors' comments, p 595: "It should be emphasized that the standards for reviewing findings by the court, as set forth in Rule 517, apply in all civil actions tried upon the facts without a jury, including law cases tried without a jury *and equity actions* tried by the court or with an advisory jury." (Emphasis supplied.)

6 "Formerly in chancery cases, although it was commonly said that issues of fact were tried *de novo* on appeal or that the Supreme Court must weigh the evidence and reach an independent conclusion on review of the facts, this did not mean that the findings of the trial judge were entitled to no consideration. Notwithstanding the right and duty of the Supreme Court to make its independent evaluation of the evidence, it would not set aside the findings of the trial judge unless it was convinced that a clear showing of error had been made. Running through the opinions are phrases such as 'clear error,' 'manifest error,' 'palpably erroneous.' * * *

"Thus it is clear that Rule 517 accurately restates former practice in the review of chancery cases in Michigan, although the language itself is borrowed from Federal Rule 52." 2 Honigman and Hawkins, Michigan Court Rules Annotated (2d ed), Rule 517, authors' comments, p 596.

See *Christine Building Company* v. *City of Troy* (1962), 367 Mich 508, 517, 518.

rehearing denied 333 US 869 (68 S Ct 788, 92 L Ed 1147). (Emphasis supplied.)

On the entire evidence I am not left with the *definite and firm conviction* that a mistake was committed by the trial judge.[7] The trial judge stated that the plaintiff's house builder witness

"made the greatest impression on the court. A home builder with considerable experience in Royal Oak, he testified that plaintiffs' land was totally unsuited to single residence development and that at least to him the land had no value for that purpose. Based on his own experience he said that lots adjacent to the unsightly and noisy railroad tracks were not readily salable for single residence purposes. He has owned 2 comparable lots for some time and has been unable to dispose of them. Furthermore, again based on his own experience, he said that adequate home financing could not be obtained on land adjacent to railroad tracks."

The trial judge thereby indicated he chose to adopt the testimony offered in behalf of the plaintiffs in preference to testimony offered in behalf of the defendant.[8]

---

[7] See *Lacey* v. *City of Warren* (1967), 7 Mich App 105, 107; *Reid* v. *City of Southfield* (1967), 8 Mich App 553, 557; *Sisters of Bon Secours Hospital* v. *City of Grosse Pointe, supra,* p 358.

[8] A house builder testified for the city that he would not hesitate to buy the property as zoned, that he wouldn't be interested unless he thought he could make 10%, and then acknowledged costs of development and sale which would preclude realization of that rate of return; he conceded he did not have any experience building or selling alongside railroad tracks, that he had not investigated the cost of making land improvements on this property, and when asked whether he had made inquiry concerning the availability of financing, replied, "I didn't go into that point, but I don't believe there would be any problem."

The parties appear to agree that if plaintiffs' property can be developed at all for single family purposes it would be necessary to remove the existing structures thereon, following which, a cul-de-sac road would be constructed north from Starr road through the center of the property, around which roughly 13 lots would be platted, some lots would face east (and thus the railroad tracks), others would face west (their rear yards adjacent to the railroad

There is no reason to reject the trial judge's evaluation of the conflicting testimony. The testimony of plaintiffs' house builder witness so adopted by the trial judge was not incredible. It was supported by the testimony of plaintiffs' appraisal witness who, while he valued the property at $11,500, stated that a prudent developer would not buy it. I interpret that to mean a speculator could be found to buy the property, but not a developer. The question before the trial judge and us, on the issue of confiscation, is whether the property can reasonably be *used* as zoned, not whether it has an exchange value. That a buyer could be found for it, that it has a buying and selling value, does not establish that anyone could be found who would develop and use the property.

Passage of time and accompanying changes in controlling facts, a change in zoning itself, might make the property more valuable and justify a speculator's investment. And then again the property might become worth less. This judicial inquiry is not concerned with the speculative possibilities of the property, but rather seeks to determine whether it can now be reasonably *used* as now zoned.

---

tracks). If the land were developed for this purpose by a land developer he would expect to make a land developer's profit. The defendant's appraisal witness in declaring the value of plaintiffs' property to be $23,000 assumed that the property could be sold without a broker directly to a builder who would be willing to remove the existing structures and do the necessary platting and land improvement without compensation other than the profit anticipated in selling the houses, with the result that some $10,000 allowed for land sales expense and land developer's profit by plaintiffs' appraisal witness would be saved to the existing owners. Defendant's experts assumed that a builder could be found to buy the land and improve it at an aggregate cost of $40,500, with a view to building thereon 13 houses at an aggregate estimated cost, including the cost of the land, of $203,000, to achieve a total *anticipated* profit of less than $17,000. The trial judge was not bound to accept that testimony. I do not have a definite and firm conviction that he erred in rejecting it.

That the 12 home owners between plaintiffs' property and Benjamin avenue foresee[9] damage to their property from further multiple development, bears out plaintiffs' expert testimony that it would be difficult to find home buyers willing to make an investment in single-family residences constructed on plaintiffs' property located, as it is, alongside extensive multiple development to the south. It is entirely believable that, with the location disadvantages of both adjoining multiple dwellings to the south and adjoining railroad tracks to the east, plaintiffs' property could not prudently be developed consistent with present zoning.[10]

The defendant acknowledges that the property could not be developed for single family use until the existing structures are removed, the property platted and utilities and other land improvements installed. On the record before him, the trial judge was entirely justified in concluding it would be so

---

[9] Compare *American University* v. *Prentiss* (DC, 1953) 113 F Supp 389, affirmed per curiam, 94 App DC 204 (214 F2d 282), certiorari denied 348 US 898 (75 S Ct 217, 99 L Ed 705).

[10] Plaintiffs' property is a 3-1/2 acre triangular-shaped parcel. The hypotenuse of the property, which runs northwesterly and southeasterly, abuts the Grand Trunk Western railroad and paralleling high tension lines. The southerly base of the triangle is Starr road, which runs east and west. The remaining, westerly arm of the triangle is east of and parallels north and south Benjamin avenue. Between Benjamin and the westerly boundary of plaintiffs' property there are approximately 12 dwellings fronting on Benjamin, valued at between $9,000 and $17,000 each, including one 3-family, 1-story multiple nonconforming dwelling. Continuing to the west, on the west side of Benjamin, is the Royal Oak municipal golf course. Starr road to the south is the first street north of 13 Mile road. The block bounded by Starr on the north, 13 Mile on the south and Benjamin on the west is improved with multiple dwellings, as is all of both sides of 13 Mile road from the railroad tracks on the east for over 5 blocks west of Benjamin to Woodward avenue, except that the blocks immediately east of Woodward are zoned commercial. With the exception of the dozen residences between plaintiffs' property and the golf course and those to the east of the elevated railroad right-of-way, the closest single-family residence to plaintiffs' property is 700 feet south of plaintiffs' property, and that 700 feet is entirely improved with multiple dwellings.

difficult to find a land developer or house builder willing to speculate in the improvement of this land in preference to land which does not have the location disadvantages which this land has, that this land was not suitable for *development* with single-family residences, and that, accordingly, present zoning was confiscatory. Such finding not being clearly erroneous, I would affirm on that issue.