Percy BEASLEY, Charles Morris, Albert Holloway and Beasley-Morris Asphalt Paving Corporation, Plaintiffs,

v.

Dale POTTER, Frank Sharp, Burton Stencil, Arthur Smith, Frank Stout, Edwin Nash, A. C. Barley, Harold Bennett, Homer Cowels, Henry Nelson, Alex Sibley, and F. Wayne Sprague, Defendants.

No. G74–48 CA5.

United States District Court, W. D. Michigan, S. D.

July 29, 1980.

Wilfred A. Dupuis, John W. Davis, Lansing, Mich., Theodore G. Albert, Iron River, Mich., for plaintiffs.

Grant J. Gruel, Grand Rapids, Mich., for defendants.

## OPINION

DOUGLAS W. HILLMAN, District Judge.

This is a civil rights action for money damages arising out of the enforcement of a zoning ordinance against a black-owned business in Ionia County, Michigan, and the subsequent denial of a variance by the Ionia County Zoning Commission, in 1972 and 1973. Plaintiffs Percy Beasley, Charles Morris, and Albert Holloway are three black men, and the former officers and sole shareholders of a Michigan corporation, Beasley-Morris Asphalt Paving Corporation (hereinafter B–M Corp.), now apparently dissolved. Defendants Dale Potter, Frank Sharp, Burton Stencil, Arthur Smith, Frank Stout, and Edwin Nash were members of the Ionia County Board of Commissioners at the time of the actions which form the basis of this lawsuit. Defendants Edwin Nash, A. C. Barley, Harold Bennett, Homer Cowels, Henry Nelson, and Alex Sibley were members of the Ionia County Zoning

Commission, and defendant F. Wayne Sprague was Ionia County Zoning Administrator during this same time. All are white men.

Defendants are sued in their official capacity as former county officials, pursuant to 42 U.S.C. § 1983.[1] Jurisdiction is founded on 28 U.S.C. §§ 1343[2] and also 1331.[3] The amount in controversy exceeds $10,-000.00. Plaintiffs' complaint alleges that defendants, acting in concert and under color of state law, retroactively imposed the zoning ordinance on their corporation; threatened criminal enforcement if they operated in violation of the ordinance; interfered with their business relations by writing to their bank and to state agencies from which plaintiffs were seeking permits, and wrongfully denied their application for a special use permit. Plaintiffs allege these actions were taken in accordance with a common scheme, the purpose of which was to exclude plaintiffs from operating an asphalt plant in Ionia County because they are black. They conclude that defendants deprived them of their rights to leased land, thereby damaging their business, and violated their constitutional rights to equal protection of the laws, to due process, and to non-impairment of the obligations of their contracts. As a result of defendants' actions, plaintiffs claim they were denied the profits from such business, their credit rating was destroyed, the assets of B–M Corp. were lost through foreclosure, and plaintiffs became personally liable for the deficits resulting from the foreclosure sale. They seek damages of $750,000.00.[4]

1. Section 1983 reads as follows:

 **§ 1983. Civil action for deprivation of rights**

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

2. Section 1343 reads as follows:

 **§ 1343. Civil rights and elective franchise**

 (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

 (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

 (b) For purposes of this section—

 (1) the District of Columbia shall be considered to be a State; and

 (2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

3. Section 1331 reads as follows:

 **§ 1331. Federal question; amount in controversy; costs**

 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

 (b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

4. This suit was initiated in then Chief Judge Fox's court in 1974. Following Judge Fox's

Defendants deny all allegations of conspiracy and discriminatory motive, and maintain their actions were taken in proper discharge of their duties and responsibilities as public officials.

The case was tried to the court without a jury. With the agreement of counsel, I bifurcated the action, reserving the matter of damages until after determination of liability. During the course of the six-day trial, the parties offered the testimony of 14 witnesses and 36 exhibits for consideration by the court. At the close of plaintiffs' proofs, I dismissed defendants Dale Potter, Frank Sharp, Burton Stencil, Arthur Smith, and Frank Stout from the case. There was no evidence whatsoever that these defendants, acting as the Ionia County Board of Commissioners, had violated plaintiffs' rights by enacting the Interim Zoning Ordinance, and no evidence connecting them with the alleged actions of the other defendants.[5] The defendants remaining in the case then proceeded to put in their defense.

Upon careful consideration of all of the evidence, I now conclude that plaintiffs have failed to sustain their burden of proof on each of the claims against the remaining defendants. For the reasons given below, I find in favor of defendants and dismiss this action with prejudice.

## DISCUSSION

The court's findings of fact and conclusions of law are contained in the following discussion. Because of the age of the case and the elusiveness of some of plaintiffs' claims, it must be noted at the outset that it was difficult at times to discern all of the elements of this action. Nevertheless, the findings and conclusions herein represent the court's best and most accurate determination of the tangled facts of the case, based on all of the testimony and exhibits.

### 1. Background.

Plaintiffs, three black men, incorporated in Michigan on February 21, 1971, under the name Beasley-Morris Asphalt Paving Corporation for the purpose of manufacturing, selling, distributing and laying asphalt. Plaintiffs were the sole shareholders and officers of the corporation. On or about July 13, 1971, plaintiffs bought a portable plant consisting of equipment for the production of asphalt from Williams Brothers Asphalt Paving Co. (Williams Bros.), a white-owned company based in the City of Ionia, Ionia County. The purchase was financed by a $50,000.00 loan, guaranteed by the Small Business Administration, from Michigan National Bank in Lansing. The plant was then located on a rural site in Eagle Township in Clinton County, where Williams Bros. had operated for several years, apparently to the displeasure of many residents of the area. When B–M Corp. applied to the Clinton County Zoning Commission for renewal of the plant's spe-

elevation to senior status in January, 1980, the case was reassigned to Judge Gibson, who subsequently withdrew, and then to me. By order of February 21, 1978, Judge Fox permitted plaintiffs to add the Beasley-Morris Asphalt Corp. as a plaintiff and further ruled that plaintiffs, as individuals, were proper parties for the purpose of vindicating the rights of the corporation. Before trial, defendants waived further objection to the standing of plaintiffs and to the sufficiency of their pleadings.

5. The only contact of the Board of Commissioners with plaintiffs' business occurred at a meeting on July 10, 1972, when it received petitions from citizens opposed to the establishment of the B–M Corp.'s asphalt plant at the site chosen by plaintiffs. In response, the board unanimously approved a motion to write the state Air Pollution Control Commission asking it to revoke its permission for installation of pollution control equipment at the plant. Pl. Ex. 4. Plaintiffs did not base their claims on this action by the board. Instead they pointed to the board's adoption on August 14, 1972, of the county-wide Interim Zoning Ordinance. *Id.* There was simply no evidence, however, that the board adopted this ordinance because of complaints about plaintiffs' business or because plaintiffs were black. On the contrary, as noted *infra*, the zoning ordinance had long been in the works. Moreover, the members of the community opposed to the asphalt plant only met Percy Beasley and learned B–M Corp. was black-owned subsequent to the August 14 meeting. I concluded that enactment of the ordinance had nothing to do with plaintiffs or their business.

cial use permit, residents wrote letters and submitted petitions to the zoning authorities complaining that the manufacture of asphalt had created excessive smoke, fumes, noxious odors, and noise and that heavy truck traffic to and from the site had damaged unimproved roads and was a safety hazard. The Eagle Township Board unanimously recommended denial of the permit. During this same time, the Air Pollution Control Section, Division of Occupational Health, of the State Department of Public Health warned plaintiffs that they needed approved emission control equipment before they could operate. Def. Ex. 3. On February 22, 1972, the Clinton County Zoning Commission voted 3–0 to deny the permit, citing public concern and "poor road servicing and health hazards". Def. Ex. 6.

Thereafter, plaintiffs decided to move the corporation's plant to a site in nearby Ionia County, which had no zoning ordinance at the time. Percy Beasley located a five-acre rural site near the corner of Cutler and Clintonia Roads in Portland Township, Ionia County. Clintonia Road runs north and south, forming the boundary between Ionia County to the west and Clinton County to the east. Cutler Road runs east into Clinton County and west into Ionia County at the intersection. This area was largely agricultural but recently had begun to attract people moving out from cities and towns. Near the intersection were several single-family homes.

Because of his previous experience, Mr. Beasley was aware that he needed permission from the state pollution control agencies in order to operate the asphalt plant. On May 5, 1972, B–M Corp. applied to the Air Pollution Control Section for a state permit to install an "air washer" pollution control system on an asphalt plant to be located on the Clintonia Road property. Pl. Ex. 12. On May 8, B–M Corp. executed a notarized lease with Edward G. Bond, Sr., and Dorothy E. Bond, owners of this site, which granted the corporation exclusive rights to take gravel from the premises and to establish an asphalt plant for a term of three years "or until the gravel is depleted from said parcel, whichever occurs first." The sole consideration mentioned in the lease is $.25 per yard of all gravel excavated and used. The lease was filed with the Ionia County Register of Deeds on May 11, 1972. Pl. Ex. 1. Also on May 8, before the same notary public who witnessed the lease, plaintiff executed a certificate of co-ownership in the name of B–M Corp., for filing in Ionia County.[6] Def. Ex. 16.

On May 16, the Air Pollution Control Section issued B–M Corp. a permit to install the air washer. Def. Ex. 21, Pl. Ex. 12. By its terms, however, the permit did not approve actual operation of the asphalt plant. Approval to operate required tests after the pollution control equipment was installed. Around this time, plaintiffs moved their equipment onto the Clintonia Road site and began setting up the plant. On May 22, B–M Corp. filed a Statement of New or Increased Use of Waters of the State for Waste Disposal Purposes with the Water Resources Commission of the State Department of Natural Resources, seeking approval for its proposed water pollution control system at the asphalt plant. Def. Ex. 14.

Sometime in early June, 1972, residents in the area of the intersection of Cutler and Clintonia Roads, including Mr. and Mrs. Harry Doehne, observed equipment on the

---

**6.** The lease and the certificate of co-partnership are the only official filings by B–M Corp. in Ionia County until its application for a special use permit on November 30, 1972. Nevertheless, throughout the proceedings Mr. Beasley insisted that he had received express authorization from Ionia County in the spring of 1972 to operate his asphalt plant, in the form of a permit of some kind. He described going to the county courthouse with Mr. Williams of Williams Bros., applying, and then returning to pick up two copies of the alleged permit. He stated the fee was between $20 and $30, which he paid with a check and that he received a receipt. The permit, Mr. Beasley claimed, was presented to an officer at Michigan National Bank for inclusion in the loan file. Despite the sincerity of his testimony, plaintiffs were unable to produce the permit mentioned by Mr. Beasley or the cancelled check or the receipt. Moreover, it is unknown what the alleged permit could be, since none was authorized or required under the laws or ordinances of the county

land and became alarmed by the prospect of an asphalt plant near their homes and farms. The Doehnes and other concerned residents soon mounted a campaign of active opposition to the asphalt plant. At first they did not know the equipment was owned by B–M Corp., but rather thought the equipment belonged to Williams Bros. When the Doehnes sought legal assistance to oppose the siting of the plant, a local attorney, accepting their belief as to the ownership of the equipment, declined to represent them because he was a lawyer for Williams Bros. and would have had a conflict of interest. By the end of June, they learned that B–M Corp. was the true owner, but still did not know the company was black-owned.

Opposition to the asphalt plant swelled over the next several months. In late June and July, residents circulated petitions for signatures urging the Ionia County Board of Commissioners to prevent establishment of the plant on the grounds it was incompatible with the agricultural and residential character of the area, would be likely to pollute, and would be a safety hazard. On July 10, 16 citizens from Portland and Danby Townships, with Mr. Doehne as spokesperson, presented 25 petitions to the Board of Commissioners. As noted, *supra* at fn. 5, the Board unanimously resolved to write the Air Pollution Control Section to ask it to revoke the B–M Corp. installation permit. Pl. Ex. 4.

During the same time, the citizens contacted other government agencies and residents, prompting them to write letters opposing the asphalt plant. For example, on July 3, the Clinton County Road Commission wrote the Ionia County authorities expressing concern over the ability of Cutler and Clintonia Roads to handle increased truck traffic anticipated as a result of the corporation's business. On July 6, the Ionia County Road Commission wrote B–M Corp. directly, warning it of the possible hazard created by increased traffic on "narrow and rolling" Clintonia Road, and noting that the bridge on Cutler Road, approximately one-half mile west of the site, could not be crossed by heavy loads. On July 12, the Portland Public Board of Education wrote the Air Pollution Control Section expressing concern that its school buses would be meeting trucks during their seven daily runs over Cutler and Clintonia Roads, which it described as "narrow and hilly". The letter reported the board's unanimous request for revocation of the B–M Corp. installation permit "because it creates a situation which is hazardous to the safety of many Portland school students." Similarly, Westphalia and Eagle Townships wrote the air pollution agency, opposing the plant on grounds of pollution and safety. Def. Ex. 13.

The air pollution agency acknowledged this outpouring of public opposition in a registered letter to B–M Corp. on August 3. Because "many persons have made known to the Commission and Commission staff their concern," the letter stated, it would hold a public meeting in Lansing to decide whether to rescind its previous approval of the installation permit. Copies of this letter were sent to plaintiffs' attorney, the Ionia County Board of Commissioners, the Portland Board of Education, the Townships of Portland, Eagle and Westphalia, and Harry Doehne, among others.

On August 15, the Air Pollution Control Section held an open hearing on the B–M Corp. plant, which both Mr. Beasley and the Doehnes attended. It was Mrs. Doehne's uncontroverted testimony that it was not until meeting Mr. Beasley at this hearing that the leaders of the opposition learned B–M Corp. was black-owned. For nearly two months prior to August 15, they had vigorously opposed establishment of the asphalt plant because they believed it would pollute the area and create a hazard on local roads. The evidence establishes that the citizens opposed the plant for neutral reasons and not because of plaintiffs' race, which had been unknown to them. In fact, the realization that Mr. Beasley was black mitigated against their opposition and momentarily weakened their resolve. As Mrs. Doehne testified, she and her husband believe strongly in equal rights and opportunity for black people, and it made her uncomfortable knowing they were opposing a

black-owned business. Nevertheless, they continued to oppose the plant on the grounds of safety and health.

## 2. The Zoning Ordinance.

In the spring of 1972, when B–M Corp. moved onto the Clintonia Road site, Ionia County had no county zoning ordinance. State law, however, had long authorized the establishment of county-wide zoning under the County Rural Zoning Act, Pub.Act 1943, No. 183, M.C.L.A. § 125.201, et seq. With the help of a grant from the federal Department of Housing and Urban Development, the Ionia County Board of Commissioners was at that time culminating four years of preparation towards a master land-use plan and a county zoning ordinance. A year earlier, on May 10, 1971, the board appointed a zoning committee for the county Planning Commission. On July 6, 1971, the board adopted a comprehensive land-use plan. Def. Ex. 9. On February 7, 1972, before B–M Corp. had moved into Ionia County, the zoning committee recommended that the board adopt the proposed zoning ordinance. Finally, on August 14, 1972, after plaintiffs had moved into Ionia County, the Board of Commissioners adopted the Interim Zoning Ordinance for Ionia County. Def. Ex. 8.

The ordinance divided Ionia County into zoning districts. The B–M Corp. site was in a district classified "agricultural". The ordinance stated that the primary purposes of the district were farming and idle land, and the secondary purpose was low-density, single-family residential lots. Art. VI, Sec. 6.2(A). A special use permit was required for a variety of non-conforming uses, including the operation of a "blacktop manufacturing plant". Sec. 6.2(B)(7)(e). The ordinance set forth, in Art. VII, regulations governing the issuance of special use permits to be administered by a zoning commission and a non-voting zoning administrator.[7]

The state enabling statute expressly protects nonconforming uses of property in existence at the time a county zoning ordinance is enacted. M.C.L.A. § 125.216. Accordingly, the Ionia County ordinance contained a "grandfather clause" which specifically provided, in Art. VIII, Sec. 8.0:

"The lawful use of any premises existing at the time of the adoption of this ordinance may be continued although such use does not conform to the provisions hereof . . . ."

The Interim Zoning Ordinance became effective upon publication on August 24, 1972.[8]

## 3. Official Actions Under the Ordinance.

On September 18, the Ionia County Board of Commissioners hired defendant F. Wayne Sprague as County Zoning Administrator. The zoning ordinance, Art. X, directed Mr. Sprague to receive and process applications for permits, inspect premises, and institute proceedings for enforcement of the ordinance's provisions. Sometime in

---

7. Section 7.2 of the ordinance states:

*Section 7.2—Basis of Determination*

The Zoning Commission shall review the proposed special use in terms of the standards stated within this Ordinance and shall find adequate evidence that such use in the proposed location:

A. Will be harmonious with and in accordance with the general and specific objectives of the *IONIA COUNTY LAND USE PLAN.*

B. Will be designed, constructed, operated and maintained so as to be harmonious with the existing or intended character of the general vicinity and that such a use will not change the essential character of the area in which it is proposed to be located.

C. Will not be hazardous or disturbing to existing or future nearby uses.

D. Will be equal to or an improvement in relation to property in the immediate vicinity and to the county as a whole.

E. Will be served adequately by essential public services and facilities or that the persons responsible for the establishment of the proposed use will provide adequately any such service or facility.

F. Will not create excessive additional public costs and will not be detrimental to the economic welfare of the county.

G. Will be consistent with the intent and purposes of this Ordinance.

8. Ionia County no longer has a county zoning ordinance. The ordinance described herein was repealed in a public referendum on February 25, 1975, by a margin of 3–1.

early November, he became aware that B–M Corp. had moved equipment onto the Clintonia Road site. Plaintiffs now maintain the new ordinance did not apply to them because the partial erection of equipment before August 24 constituted a prior lawful use of the premises within the grandfather clause. But Mr. Sprague thought otherwise and decided B–M Corp. was covered by the ordinance. He wrote plaintiffs on November 14, as follows:

"It is my understanding that you plan to erect an asphalt plant on the Ed Bond property located in the SE1/4 of the SE1/4 of Section 36 Portland Township Ionia County, Michigan.

"It is my duty to inform you that you are in violation of the Ionia County Interim Zoning Ordinance. Enacted August 24, 1972. Due to the fact that you have moved equipment on this property without a Zoning Permit.

"A Special Use Permit is required for this type of operation and can be issued only after the ~~Board of Appeals~~ [effaced] Zoning Comm Acts on the request of such.

"I would be glad to discuss this further in my office which is located in the Court House Annex Building in Ionia, Michiga [sic]." Pl. Ex. 2.

Defendant Sprague testified that he had determined plaintiffs were not exempt from the requirement of a special use permit, by virtue of the ordinance's grandfather clause, because he knew they were not yet "doing business" on the property. Since he had not visited the site at the time he wrote the letter, the clear implication is that he was informed about the plant by the citizens opposed to it.

This inference is confirmed by the circumstances surrounding another letter written two days later by Mr. Sprague. Mr. Beasley testified that B–M Corp. had pending at this time an application for a second loan from Michigan National Bank to cover operating expenses. On November 16, defendant Sprague wrote to Don Monnette, small business loan officer at the bank. The letter states:

"I have been informed that you are processing a small business loan to a Beasley Morris Corp. for the purpose of erecting an Asphalt Plant in Section 36 of the Portland Township, Ionia County, Michigan. I have recently informed them by certified letter that they are in violation of the Ionia County Zoning Ordinance, in that they have not requested a special use permit for that purpose. Since this area is Zoned Agriculture they must do this to conform with the Ordinance.

"I am sure you should have this information or at least would like to know of the situation.

"It has also been brought to my attention that the County Road Commission has a bridge with a three ton load limit within a very short distance of the proposed location and all damaged [sic] sustained by same would be their responsibility. They have written Beasley Morris of this situation with no responce [sic] from them." Pl. Ex. 3.

Under questioning at trial, Mr. Sprague denied that his purpose in writing this letter was to discourage the bank from making a loan to B–M Corp. He stated it was his duty to inform people if they were in violation of the ordinance, but could not recall other cases in which he had supplied this information to third parties. He took this apparently unusual step, he testified, at the request of "interested people" who lived in the area where the plant was to be erected because he believed it was his duty to comply with citizens' requests.

The Ionia County file includes a copy of another letter to Mr. Monnette written by Mr. Doehne on November 27. It states that it is a follow-up to a telephone conversation of November 16, the date that Mr. Sprague wrote his letter to the bank. Mr. Doehne enclosed letters and petitions, like those described *supra*, which voiced "safety, health, land use and nuisance" objections to the asphalt plant. On the bottom of the letter is a handwritten note, initialed by Mr. Doehne, which reads:

"Phoned Wayne Sprague re this on 11/16 suggesting as a concerned taxpayer that SBA & MNB be made aware of the situation. HAD" Def. Ex. 13.

It is apparent that Mr. Sprague's original interest in the B–M Corp. site and his letter to Michigan National Bank on November 16 were prompted by Mr. Doehne and other citizens who opposed establishment of the plant. The natural and probable effect of the zoning administrator's letter was to discourage the bank from making a further loan to plaintiffs, and it can be inferred this was its purpose. Mr. Beasley testified that B–M Corp. did not receive the second loan and consequently was unable to buy needed pollution control equipment or to move its plant to another site. Despite the suggestiveness of Mr. Sprague's actions, however, no evidence was offered to the court which would indicate why the second loan was not approved. No letters or documents from the bank were produced and no witnesses from the bank testified. It is not known whether the county zoning situation was even a factor in the decision.

The balance of Mr. Sprague's actions during this period appear to have been impartial and in fulfillment of his duties under the ordinance. On November 30, Mr. Beasley came to Mr. Sprague's office and made application for a special use permit to operate the asphalt plant. Def. Ex. 1. He paid Mr. Sprague an application fee of $25.00 on December 4. Def. Ex. 2. Plaintiff did not contest the application of the ordinance to his corporation and did not claim a pre-existing use under the grandfather clause at the time.

In conversation with Mr. Beasley, Mr. Sprague explained that operation without the permit was punishable by fine or jail term under the ordinance. Mr. Beasley assured him the corporation was not operating. In fact, the plant was not yet fully assembled at this time. Plaintiffs' application stated the estimated completion date of construction was "3/73", three months later, and Mr. Beasley testified that after meeting with the zoning administrator, he continued to assemble the plant. Although

plaintiffs argue that defendant Sprague's letter and conversation conveyed a threat which prevented them from operating the plant, I believe Mr. Sprague's comments were reasonable in light of his judgment of the facts and within his discretion. Assuming arguendo they were meant to intimidate plaintiffs, the evidence nevertheless indicates that the plant could not have been operated at that time because construction was not complete, the plant did not have necessary pollution control equipment and permits from the state, and plaintiffs lacked operating capital. Furthermore, Mr. Beasley testified that the asphalt business was largely seasonal, operating in the warm months of the year, and it was then the beginning of December.

Mr. Sprague promptly presented plaintiffs' application for a special use permit to the zoning commission at its next meeting on December 5. The minutes show that the application was tabled while Mr. Sprague researched the "Special Use Requirements" of Clinton and other counties. Def. Ex. 12. At the next meeting on December 18, the zoning commission scheduled a public hearing on the application for the evening of January 15, 1973, at the Ionia Courthouse. Mr. Sprague was directed to advertise the hearing, write property owners within 300 feet of the proposed plant, research "requirements on pollution", and contact the state Air Pollution Section, the state Department of Natural Resources, and the county Health Department "for thier [sic] requirements". *Id.* He wrote the letters as directed, including one to B–M Corp.

Also on December 18, the Air Pollution Control Section informed B–M Corp. it was voiding the permit to install issued on May 16 because the pollution device had not been installed and operated as proposed. Def. Ex. 23. The Water Resources Commission of the Dept. of Natural Resources wrote B–M Corp. on January 5, 1973, informing it the commission would not approve the waste disposal proposed in the statement of May 22 because such disposal would endanger ground supplies in the area. Pl. Ex. 9.

On January 15, the public hearing was held before an audience of about 35 persons. Mr. Beasley was present and spoke in favor of his permit application. Mr. Doehne and others, including fellow residents and the supervisors of Portland and Danby Townships, spoke in opposition. Letters and resolutions expressing fears about pollution, health problems, and traffic hazards were entered on the record. Because not all members of the zoning commission were able to attend, the meeting was tape-recorded at the request of the acting chairperson, defendant Harold Bennett.

Plaintiffs' application for a special use permit came up for decision at the zoning commission's regular meeting on January 30, 1973. By this time, several of the defendants had visited the site of the B–M Corp. plant, including Mr. Sprague, Mr. Bennett, Mr. Nash, and Mr. Sibley. Negative information and opinions from local townships, schools, the Department of Natural Resources, the Michigan State Police, and residents had been received and deposited in the commission file. At the meeting, the entire tape of the January 15 hearing was played for the commission. Mr. Beasley was present and sat at the same table with the defendant commissioners. During a discussion lasting over one hour, Mr. Beasley answered questions about the operation of the proposed plant and its site and six people spoke in opposition. At no time in any of the meetings of the zoning commission did defendant Sprague, the zoning administrator, make a recommendation about the disposition of plaintiffs' application nor did he vote. And at no time did defendant members of the commission discuss the application among themselves outside the meeting. As members of the new commission, representing diverse parts of the county, they did not know each other well and had had little or no occasion to meet apart from official business.

At the conclusion of the open discussion, and without consultation among themselves, the commission members voted to deny the B–M Corp. application for a spe-cial use permit by a vote of 5–2. The reason given was that the plant would not be adequately served by essential public services and facilities, under Sec. 7.2(E) of the ordinance, because the roads were unsafe for heavy truck traffic. Def. Ex. 13. Defendants Bennett, Barley, Nash, Nelson and Sibley comprised the majority.[9] Def. Ex. 7.

Within the next six weeks following the vote, the Water Resources Commission formally denied the B–M Corp. request for waste disposal and the Air Pollution Control Division reported Mr. Beasley's plans to move the plant to a new site in Clinton County. Def. Ex. 4, 24. Apparently, the plant was never moved or operated and Michigan National Bank eventually foreclosed on the equipment in partial satisfaction of the corporation's debt, leaving the individual plaintiffs liable for the deficit.

### 4. Plaintiffs' Claims.

Plaintiffs make three constitutional claims under Sec. 1983. The major charge is that defendants prevented them from doing business in Ionia County because they are black, while another asphalt plant owned by whites was permitted to operate unimpeded, thereby denying plaintiffs equal protection of the laws.

It is by now axiomatic that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Aggrieved parties must prove a racially discriminatory intent or purpose as well. *Washington v. Davis*, 426 U.S. 229, 239, 242, 96 S.Ct. 2040, 2047, 2049, 48 L.Ed.2d 597 (1976). This requirement has been interpreted in subsequent opinions. Thus, in a recent zoning case, *Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), the Court stated:

> "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or

---

**9.** No vote was recorded for defendant Homer Cowels.

administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominate' or 'primary' one."

And, in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), the Court stated:

> " 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences . . It implies that the decision-maker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (Citations and footnotes omitted.)

█ The courts have frequently noted the difficult and sensitive task of ascertaining the intent behind official actions. *See, e. g., Davis, supra*, 426 U.S. at 253, 96 S.Ct. at 2054 (Stevens, J., concurring). By its very nature a racially discriminatory purpose for challenged acts is unlikely to be expressed on the record. Discriminatory intent, if it exists, necessarily must be inferred by the court from the totality of the evidence, whether direct, indirect, or circumstantial. The district court is assisted in this subtle task by its opportunity to observe the demeanor of defendants under cross-examination at trial.

In the instant case, plaintiffs have failed to carry their burden of proving that racially discriminatory intent was a motivating factor in defendants' actions. At trial, defendants Bennett, Nash, Nelson and Sibley each testified he voted against the B–M Corp. application because he believed increased truck traffic caused by the asphalt plant on narrow, unimproved Cutler and Clintonia Roads would constitute an unacceptable safety hazard to school buses. All emphatically denied that defendants' race was ever mentioned during their deliberations or had anything to do with their decision.

█ I have had the opportunity to study the record available to defendants at the time and to observe them on the witness stand. With due consideration for the difficulty of proving discriminatory intent, I nevertheless believe defendants told the truth and that race was not a factor in denying the permit. Plaintiffs argue that the vehemence of some of the denials is what one expects from the guilty and confirms their charges. ("The lady doth protest too much, methinks." *Hamlet*, Act III, Scene ii.) But they utterly fail to bolster this contention with evidence and I must accept defendants' statements for what they are: expressions of honest outrage at unprovable and unpleasant allegations.

Furthermore, plaintiffs' characterization of the unequal treatment of Williams Bros., the white-owned company, and themselves is faulty. Zoning is by nature specific to a particular location and time. Denial of special permission to operate the B–M Corp. asphalt plant in an agricultural district is not comparable to Williams Bros.'s operation in a non-agricultural district. Plaintiffs have not compared two businesses similarly located whose only distinction was the race of the owners. In fact, the zoning ordinance did not apply to Williams Bros. at all, Mr. Nash testified, because the company had been in business for many years on land leased from the state and was not subject to county zoning.

Finally, it was not true that the zoning commission denied plaintiffs the right to operate their asphalt plant anywhere in Ionia County. Contrary to plaintiffs' assertions, the Clintonia Road site was not the only place they could do business and denial of a permit for that property did not restrict them from relocating to a district zoned industrial. Several witnesses testified that this suggestion was made to Mr. Beasley at the January 30 meeting. Mr. Beasley, in turn, explained that the plant was not moved because it would have cost approximately $2,500.00 and the corporation lacked operating funds. The facts do not support plaintiffs' contention that denial of the permit destroyed their business.

· The only suggestion of a racially discriminatory motive for imposing the new ordinance on plaintiffs and ultimately denying them a permit, came from defendants Sprague and Barley. Plaintiffs offered the friendly testimony of Theodore Ferris, one of the two members of the zoning commission who voted to grant the permit. Mr. Ferris, a self-confessed opponent of zoning in principle, testified that at the January 30 meeting, Mr. Sprague said, "If we let one in, they will all come in." Although a seemingly obvious racist comment referring to black persons, under repeated questioning by plaintiffs' attorneys, Mr. Ferris steadfastly maintained that he believed it referred to blacktop manufacturing plants.

Mr. Sprague himself testified that after the vote, Mr. Beasley complained the permit had been denied because of his race. Mr. Sprague said he replied, "I hope you don't think you were denied because you are black." Plaintiffs would have the court interpret this statement for a meaning exactly opposite to the one expressed on its face. Instead of expressing concern that no misunderstanding exist, they argue it indicates a guilty conscience. I disagree. There is simply no evidence that Mr. Sprague was motivated by plaintiffs' race when he adjudged them in violation of the ordinance and wrote the bank in November, or subsequently as he gathered information for presentation to the zoning commission. As noted *supra*, he was responding with some zeal to requests from citizens opposing the plant and, subsequently, the commission. None of his actions overstepped the limits of his job, with the possible exception of the letter to the bank. But not even this was motivated by racial animus and there is no evidence it had any effect whatsoever. In this context, I conclude that his statement to Mr. Beasley was innocent and did not reveal a racially discriminatory intent behind defendants' actions.

The remaining suggestion came from the testimony of defendant A. C. Barley. On cross-examination, Mr. Barley was asked about the reasoning behind the decision to deny the B–M Corp.'s permit. He replied:

". . . I think that most people felt that it was—it sounds like you are talking to a child, but it was probably in his better interest to do this. I think—let me expand that a little bit, if I can recall. I think—they had the feeling that this was a market—and I use it, I put quotation marks on that word 'market'—that was not very fertile. Really there wasn't—well, it's small, let's put it that way. Then we come to the fact that he was a black man in a county predominantly white, and I think they thought that he wasn't—he might not succeed for that reason even though he might be very good in what he did. And let's say it was a little unusual for that kind of a county.

\* \* \* \* \* \*

I don't really think it could be classified as a determination where everything was reviewed, pro and con, and all of the data that we could possibly get on the decision was brought in. I think it was, as I remember the discussion of it, was that it probably wasn't in the best interest of the gentleman to come into that area because he wasn't too well known and he was coming into an area which was mostly farm. And from that point on I just—I remember that it went to the fact that, 'Gee, why doesn't he go someplace where he is probably going to be able to make more money anyway.' And I don't—what I am saying is—and I think this was valid and sincere—that his wanting to come into that area was not good business. There wasn't a business there in the first place, and there may have been a few blacks there, but I didn't know who they were. On the other hand, if he had gone into one of the larger cities or near it—and I still believe this might have happened—he might have been very, very successful."

In other words, Mr. Barley determined that a black business could not prosper without black customers, that there were not enough blacks in Ionia County to support the B–M Corp. plant, and that it would be in plaintiffs' best interest not to receive a special use permit. This paternalistic reasoning was clearly racist and improper.

The question remains, however, whether it reflected the thinking of the rest of the defendants or only Mr. Barley. Although Mr. Barley suggested there was a consensus, under questioning he admitted he could not remember if others felt as he did. Moreover, Mr. Barley proved to be an unreliable witness. He was unable to remember any conversation at the January 30 meeting. He also could not recall Harold Bennett's name or the fact Mr. Bennett was acting chairperson on January 30 or even his face, although Mr. Bennett was present in the courtroom. He did not remember if he had attended the January 15 hearing. An elderly man, Mr. Barley finally stated, "Well, as I prefaced this meeting [sic] right here, one of my great failings is my memory. . . ." On the stand, he appeared to be reconstructing the events surrounding the vote in an attempt to help the other defendants. Mr. Barley obviously thought his misplaced solicitude for plaintiffs was exculpatory and was offering it to convince the court defendants' motives were benign. Mr. Barley's casual suggestion that the racially discriminatory intent behind his vote characterized the votes of the other defendants was flatly contradicted by testimony that they did not consider race and did not discuss their thinking among themselves. Consequently, I find that only Mr. Barley's vote was tainted by racial bias. There is no evidence that a conspiracy existed among the defendant members of the zoning commission to deny plaintiffs a permit because they are black. Even though Mr. Barley's vote was improper, a majority of four commission members still voted down the permit for neutral reasons. Accordingly, I hold that plaintiffs are unable to show that defendants, acting under color of state law, denied them equal protection of the laws.

■ Plaintiffs' second charge is that defendants denied them due process by applying the ordinance against a lawful, pre-existing use.[10] In order to invoke due process protection, parties must identify a constitu-

tionally protected liberty or property interest and then assess the appropriate measure of procedural protection. See, Colm v. Vance, 567 F.2d 1125 (D.C.Cir.1977). The existence and extent of protected interests are defined by the controlling state law. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Although nowhere spelled out by plaintiffs, they apparently believe their liberty and property interests are embodied in the lease of the Clintonia Road site, the use of the land, and their prospective ability to take advantage of business opportunities.

■ As a general principle, however, under Michigan law, no one has a vested right in existing zoning, for zoning is not a contract which forecloses subsequent amendment. City of Ann Arbor v. Northwest Park Const. Co., 280 F.2d 212, 216 (6th Cir. 1960). Similarly, a party has limited protection against the application of a new ordinance to previously unzoned land. A party does not acquire a protected interest in a nonconforming use of property unless he can show nonconformance in a reasonably substantial manner. Township of Fruitport v. Baxter, 6 Mich.App. 283, 148 N.W.2d 888 (1967). Mere preliminary operations do not give rise to a vested right. Thus, it was insufficient to order plans, survey land, and remove old buildings to establish a nonconforming gravel mine, Bloomfield Township v. Beardslee, 349 Mich. 296, 84 N.W.2d 537 (1957), or to knock down an old shed, put up a sign, and erect some fences to establish a nonconforming junk yard, Warholak v. Northfield Township Supervisor, 57 Mich.App. 360, 225 N.W.2d 767 (1975). Cf. Dingeman Advertising, Inc. v. Algoma Township, 393 Mich. 89, 223 N.W.2d 689 (1974), in which the staking out of a billboard and installation of a transformer and powerline were deemed to confer a vested right to use property for a nonconforming billboard. In the instant case, B–M Corp. had moved its equipment onto leased land and begun to erect its

---

**10.** Plaintiffs do not attack the validity of the zoning ordinance itself nor do they allege an unconstitutional taking of their property.

plant, but it lacked essential pollution control equipment and never operated at the site. Plaintiffs did not use the site in a reasonably substantial manner either before or after enactment of the ordinance. In light of the relevant Michigan law, it is highly doubtful they had a constitutionally protected interest.

 Evaluation of whether or not a pre-existing, nonconforming use is substantial is necessarily subjective and varies from case to case. As a general rule, official actions come cloaked with a rebuttable presumption that public officers have applied a zoning ordinance in a regular and lawful manner. *See generally, Kropf v. City of Sterling Heights*, 391 Mich. 139, 215 N.W.2d 179 (1974); *Sun Oil Co. v. City of Madison Heights*, 41 Mich.App. 47, 199 N.W.2d 525 (1972); 82 Am.Jur.2d, *Zoning and Planning*, § 354, at 936. If a classification of property for zoning purposes is not unreasonable or arbitrary, but fairly debatable, it will be upheld by a court. *Brae Burn, Inc. v. City of Bloomfield Hills*, 350 Mich. 425, 86 N.W.2d 166 (1957); *Tocco v. Atlas Township*, 55 Mich.App. 160, 222 N.W.2d 264 (1974). I believe defendant Sprague's judgment that plaintiffs were not exempt from the requirements of the ordinance, because they were not yet in business but merely assembling equipment, was reasonable. Moreover, even if plaintiffs did have protected interests in their nonconforming use of the land, and the zoning administrator was wrong, they had full notice and opportunity to appear before the zoning commission, not once but several times, to plead their case and voice any objections. I hold defendants did not deny plaintiffs due process.

Although not argued at trial, the third charge made by plaintiffs' complaint is that defendants impaired the obligations of their "lease, mortgages and other contracts" by enacting the zoning ordinance and enforcing it against them, in derogation of their rights under the "contract clause" of Art. I and the Fourteenth Amendment of the U.S. Constitution. As noted *supra* at fn. 10, plaintiffs do not challenge the validity of the ordinance itself and I have ruled that the enactment of the ordinance by the Board of Commissioners was not wrongful. As a result, the basis that remains for this charge is narrow.

 The modern Supreme Court has not construed the contract clause as a literal injunction against all state laws which abridge existing contractual relationships. *See, Home Bldg. and Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). The clause does not prevent a state or its subdivisions from exercising its police power to protect the lives, health, morals, comfort and general welfare of the public. *Manigault v. Springs*, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905). Zoning is, of course, a legitimate exercise of the police power. *Agins v. City of Tiburon*, —— U.S. ——, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn. Central Transp. Corp. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *City of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

 The contract clause continues to impose some limits on state power. The cases instruct the reviewing court to evaluate the reasonableness of the legislation. The court must determine whether the state law has operated as a substantial impairment of the contractual relationship. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978); *see also, U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *City of El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). Using this test in the instant case, I find that enactment and application of the zoning ordinance did not substantially impair plaintiffs' contracts. The lease of the Clintonia Road site was for both the excavation of gravel and the manufacture of asphalt, and rent was calibrated to the volume of gravel taken alone. Plaintiffs could still derive substantial value from the lease, although deprived of the highest intended use of the land. As for their contractual relationship with the bank, plaintiffs had the benefit of their investment in the equip-

-ment, which could be moved to another site and operated there. Requiring a permit for the Clintonia Road site and then denying the corporation's application did not impair its obligation to repay the loan but only incidentally burdened plaintiffs by making it necessary to move to a properly zoned location. The inability of plaintiffs to ultimately repay the loan was due to a combination of factors, of which the zoning ordinance was only one.

I conclude that application of the zoning ordinance to plaintiffs was a valid exercise of the county's police power. It did not unreasonably or substantially impair the obligation of their contracts.

## CONCLUSION

It is not hard to feel tremendous sympathy for Mr. Beasley and his partners as one watches them slowly enveloped by the manifold coils of state and local bureaucracy. Plaintiffs demonstrated great patience and determination in seeking to comply with the requirements of the various statutes to which their business was subject. As they met one frustrating barrier after another, it is understandable that they might conclude they were being systematically discriminated against, and that they should vindicate their rights in court.

The federal judiciary plays a vital role in safeguarding the rights of all persons. But in fulfilling that role, a court has a responsibility to judge impartially and to treat all fairly. A judge must thrust aside his natural sympathies to find the true facts in a case and to do justice to all parties. Although plaintiffs may have had grounds to suspect discrimination, they were, nevertheless, attempting to set up a business whose pollution, stench, and other undesirable features are well-known. To attempt to erect an asphalt plant in an agricultural area where there were homes valued in excess of $50,000 is bound to bring about protest, regardless of the race of the owners. In view of the public outcry in Clinton County, plaintiffs could hardly have been surprised at the reaction in Ionia County. In this case, I believe defendants, as public servants, acted reasonably and for neutral reasons in enforcing the zoning ordinance.

The results, undeniably, were detrimental to plaintiffs' interests, but they were untainted by racial animus. As public officials, defendants were influenced by a well-organized group of local citizens opposed to the asphalt plant, but under our system of government it is certainly not unconstitutional to lobby officials for a particular point of view. Again, there was no hint of bias in that opposition.

In conclusion, I hold that plaintiffs have failed to prove that defendants acted in concert to deprive them of their constitutional rights. I find in favor of defendants on all counts and dismiss this suit with prejudice. Each side is to assume its own fees and costs.

IT IS SO ORDERED.